Opinion
 

 SILLS, P. J.
 

 Western Digital Corporation seeks extraordinary relief from an order disqualifying its counsel and a key expert witness for a conflict of interest. The trial court found that Western Digital’s adversary in this litigation had disclosed confidential information about the lawsuit to members of a consulting firm it had interviewed but did not retain as expert witnesses. Following that disclosure of confidences, a new member joined the consulting firm and was later hired by Western Digital as an expert in
 
 *1476
 
 this litigation. Applying
 
 Shadow Traffic Network
 
 v.
 
 Superior Court
 
 (1994) 24 Cal.App.4th 1067 [29 Cal.Rptr.2d 693], the court concluded disqualification of both the expert and Western Digital’s counsel was required.
 

 Western Digital filed a petition for writ of mandate challenging the recusal order. We issued an alternative writ and, after hearing oral argument on the matter, we conclude the court abused its discretion in ordering the disqualifications. As we explain below, the evidence does not support the court’s implied finding that Western Digital’s expert was exposed to the confidential information its opponent shared with the nonretained members of the consulting firm. Consequently, neither Western Digital’s expert nor its counsel should have been disqualified.
 

 I. Factual and Procedural Background
 

 Amstrad pic is a British-based manufacturer of personal computers. The underlying litigation concerns Amstrad’s claim that Western Digital sold it defective hard disk drives for use in Amstrad’s PC 2286 computer—a new product Amstrad launched in the late 1980’s. In its first amended complaint, Amstrad asserts the “epidemic failure” of the disk drives caused “catastrophic financial consequences” for Amstrad. Amstrad seeks more than $186 million in damages for out-of-pocket costs, lost profits and damage to its goodwill and reputation. In defending the lawsuit, Western Digital contends its disk drives were not defective and the problems with the PC 2286 were caused by defects in Amstrad’s computers.
 

 Amstrad first sued Western Digital in federal court in September 1991. The action was dismissed for lack of jurisdiction and Amstrad filed this action in December 1992. In early 1991, Western Digital retained Irell & Manella (I&M) to handle its dispute with Amstrad. Since 1991 I&M has expended over 15,000 hours of professional time on the matter, for which Western Digital has paid the firm over $2.5 million.
 

 A.
 
 Amstrad’s contacts with Hankin & Co.
 

 In December 1991, Amstrad’s counsel, Mayer, Brown & Platt, met with members of the professional consulting firm Hankin & Co. to explore retaining them to perform certain damage calculations and to have the firm’s founder, Rock Hankin, provide expert testimony on damages issues. Amstrad did not then retain the firm. In September 1993, Amstrad again met with Rock Hankin and other Hankin & Co. personnel to discuss retaining them for this litigation. After the meeting, Hankin & Co. prepared a draft retainer letter setting forth its proposed damages methodology along with
 
 *1477
 
 information about the firm’s resources and fees. Still, Amstrad did not hire the firm to work on the case. In June 1995, Amstrad met once more with Hankin & Co. but did not retain the firm.
 

 B.
 
 Western Digital’s search for an “autopsy” expert
 

 In October 1996, I&M attorney Andra Barmash Greene joined the Western Digital litigation team to search for and retain experts on various issues. In November 1996, Greene began her search for what the litigation team termed an “autopsy expert.” According to a declaration submitted by Greene, the autopsy expert is not simply a “numbers cruncher” but will be expected to testify on computer technology issues. Greene’s declaration explains that “the autopsy expert will relate Amstrad’s choices in design, integration and manufacture to their respective technical efficacies as well as to other computer manufacturers’ choices in the same market during the same period. The autopsy expert will do this examination, analysis and comparison for each component, design choice, internal integration and manufacturing decision in the PC2286.”
 

 Greene’s declaration details her extensive search for someone with “both technical computer hardware and hard disk drive expertise, as well as management consulting experience in both the domestic and international personal computer businesses and market.” She pursued approximately 40 potential autopsy experts. Greene eventually found her autopsy expert at Hankin & Co.
 

 Dan Carter joined Hankin & Co. in late 1995, several months after Amstrad’s last meeting with members of that firm. He had never had any contact with Amstrad. Greene considered Carter an ideal candidate for autopsy expert because he had a background in computer hardware technology as well as management experience with computer companies in Europe. Importantly, Carter had served as the managing director of a Western Digital competitor in the United Kingdom during the same time period Amstrad allegedly suffered lost sales due to Western Digital’s purportedly defective disk drives. Carter’s European experience gave him percipient knowledge of the relevant market and product, which Greene felt could be highly significant for autopsy testimony.
 

 C.
 
 Western Digital’s retention of Hankin & Co.’s Dan Carter
 

 In late November 1996, Greene left a voice mail message for Carter explaining that, based on a referral, she was considering using him as an expert for Western Digital on a matter involving Amstrad. Carter reported
 
 *1478
 
 the information to Rock Hankin, who told Carter that he and another of the firm’s principals, Wally Jones, had met with Amstrad’s lawyers in a “beauty contest” but had not been hired. He directed Carter to review the firm’s files on the matter. Carter found two letters, one the draft retainer letter prepared by Hankin & Co. for the Amstrad/Westem Digital matter in 1993, and another a letter from Amstrad’s counsel dated 1991 which informed Rock Hankin a different matter had settled and the firm’s services were not required. According to Carter’s declaration, he misread the date on the draft retainer letter, thinking it was sent in 1991, and concluded the 1991 letter from Amstrad’s counsel was sent in response, declining the firm’s services on the Western Digital matter.
 

 According to the declarations of both Hankin and Carter, Hankin told Carter nothing of the substance of his meetings with Amstrad. Hankin directed Carter to inform Ms. Greene of the firm’s earlier participation in a “beauty contest” with Amstrad, and asked Carter to have Wally Jones call Amstrad’s lead counsel at Mayer, Brown & Platt to inform him they had been approached by Western Digital and to see if Amstrad intended to hire Hankin & Co. on the matter. Apparently Jones left a more cryptic message which deleted the reference to Western Digital and merely inquired if Hankin & Co. could perform any services for Mayer, Brown & Platt. The call was not returned.
 

 Carter contacted Greene and told her that Hankin and Jones had met with Amstrad and Amstrad’s counsel in a “beauty contest” in 1991, no confidential information had been disclosed, and Amstrad had not retained Hankin & Co. Carter also told Greene of the existence of the draft retainer letter but said nothing of its contents.
 

 Despite having learned of Amstrad’s prior contact with Hankin & Co., Greene apparently chose not to discuss with Amstrad’s counsel whether Western Digital’s hiring of Carter, a Hankin & Co. employee, would create a conflict of interest. After meeting with Carter to discuss his background and relevant experience, Greene hired him as Western Digital’s autopsy expert. Additionally, Greene asked Carter to put together a team of experts (the Carter team) to work on various damages issues, including “numbers crunching.” She specified that no member of the Carter team could have had any prior contact with Amstrad.
 

 Declarations from all relevant Hankin & Co. personnel attest to the creation of an ethical screening wall that purportedly prevented Rock Hankin and Wally Jones from disclosing to the members of the Carter team any confidential information they (and other since-departed members of the firm)
 
 *1479
 
 had learned from their interviews with Amstrad. The adequacy of that screening wall was a key factual issue in the proceedings below and will be examined in detail in a later section of this opinion.
 

 D.
 
 Amstrad’s motion to disqualify
 

 When Western Digital disclosed to Amstrad its retention of Hankin & Co.’s Dan Carter as an expert, Amstrad immediately objected. Amstrad asserted Hankin & Co. had a conflict of interest in light of its prior contacts with Amstrad regarding the case. Amstrad contended it disclosed sensitive, confidential information to Hankin & Co. in its 1991, 1993, and 1995 meetings. Amstrad argued, further, that the entire I&M firm had a conflict of interest resulting from its receipt of Amstrad’s confidential information from Hankin & Co. I&M and Hankin & Co. refused to withdraw from the case and Amstrad filed a motion to disqualify both of them.
 

 After receiving a mountain of paperwork from both sides, the trial court canceled the hearing on the motion and took the matter under submission. By minute order, the court granted Amstrad’s motion in its entirety. Western Digital then moved for reconsideration, arguing that the court should consider something less than disqualification of the entire law firm. Specifically, Western Digital argued that if the court were persuaded Hankin & Co. passed Amstrad’s confidences on to Ms. Greene, then only Ms. Greene should be disqualified since the evidence established she did not share any substantive information concerning Amstrad’s contacts with Hankin & Co., the draft retainer letter or Amstrad’s damage theories with her I&M colleagues.
 

 The court denied the reconsideration motion on jurisdictional grounds, finding it failed to state new facts or law. Western Digital then petitioned for a writ of mandate.
 

 II. Discussion
 

 In ordering the disqualification of I&M and Carter, the trial court found the case of
 
 Shadow Traffic Network
 
 v.
 
 Superior Court, supra,
 
 24 Cal.App.4th 1067 to be controlling for this “fact pattern.” In
 
 Shadow Traffic,
 
 Latham & Watkins was disqualified from further representing the defendant after retaining as an expert witness an individual previously interviewed by plaintiff’s counsel and to whom plaintiff’s counsel disclosed confidential information about the lawsuit. The striking factual similarity between that case and the instant one is that the party moving for disqualification never actually retained the expert but contended the expert was nonetheless exposed to its confidential information. Significantly, the court held that “. . .
 
 *1480
 
 communications made to a potential expert in a retention interview can be considered confidential and therefore subject to protection from subsequent disclosure even if the expert is not thereafter retained as long as there was a reasonable expectation of such confidentiality.”
 
 {Id.
 
 at p. 1080.)
 

 In
 
 Shadow Traffic
 
 the court specifically found that the plaintiff had a reasonable expectation of confidentiality in its interview with the nonretained consulting firm, and did disclose confidential information during the interview. (24 Cal.App.4th at pp. 1083-1084.) Applying a presumption first created in
 
 In re Complex Asbestos Litigation
 
 (1991) 232 Cal.App.3d 572 [283 Cal.Rptr. 732], the court in
 
 Shadow Traffic
 
 concluded that defense counsel’s hiring of an expert who had been exposed to plaintiff’s confidential information in a retention interview gave rise to a
 
 rebuttable presumption
 
 that the expert shared plaintiff’s confidential information with defense counsel.
 
 (Shadow Traffic Network
 
 v.
 
 Superior Court, supra,
 
 24 Cal.App.4th at p. 1085; see also
 
 In re Complex Asbestos Litigation, supra,
 
 232 Cal.App.3d at p. 596.) Because defense counsel failed to rebut this presumption, the court in
 
 Shadow Traffic
 
 concluded disqualification of the law firm was required.
 
 [1]
 

 In the instant case, the court made findings, both express and implied, which parallel those made by the court in
 
 Shadow Traffic.
 
 The court here specifically found Amstrad’s counsel revealed confidential information to Hankin & Co. Implicit in that is the finding Amstrad had a reasonable expectation of confidentiality in its discussions with the consulting firm. The court further impliedly found this confidential information was disclosed to Carter, and Carter disclosed these confidences to I&M, necessitating the disqualification of both. Western Digital attacks each of these findings as unsupported by the evidence.
 

 Our review of the challenged findings is limited to determining whether they are supported by substantial evidence. If substantial evidence does support these express and implied findings of fact, then we review “the conclusions based on the findings for abuse of discretion. . . . [T]he importance of disqualification motions requires careful review of the trial court’s exercise of discretion. [Citation.]”
 
 (In re Complex Asbestos Litigation, supra,
 
 232 Cal.App.3d at p. 585.)
 

 A.
 
 Did Amstrad communicate confidential information to Hankin & Co. ?
 

 Western Digital mounts a two-pronged attack on the finding that Amstrad communicated confidential information to the Hankin firm. First,
 
 *1481
 
 Western Digital contends Amstrad had no reasonable expectation of confidentiality in the retention interviews since there was no signed confidentiality agreement and at the first two meetings (1991 and 1993) Amstrad failed to even mention it intended the conversations to be confidential. Second, Western Digital asserts the meetings were merely phases of a “beauty contest” at which no confidential information was disclosed by Amstrad.
 

 Both arguments are easily disposed of. As to whether Amstrad reasonably expected confidentiality in its meetings with Hankin & Co., declarations from Amstrad’s attorneys attest to their expectation, based on years of experience dealing with expert witnesses, that preretention interviews are always held in confidence. Significantly, in his deposition Rock Hankin confirmed that he has always treated such communications as confidential. This evidence suffices to support the court’s implied finding Amstrad had a reasonable expectation of confidentiality concerning these preretention meetings.
 
 [2]
 

 Likewise, substantial evidence supports the court’s finding that confidential information was in fact disclosed at these meetings. Amstrad’s lead attorney Neil Soltman stated in his declaration that at the 1993 and 1995 meetings, “[I] initially provided [the Hankin firm] with my views of the progress of the litigation, my evaluation of the strengths and weaknesses of our liability case, my prognosis for the remainder of the case and my analysis of the strengths and weaknesses of the damage issues as I expected them to eventually be litigated, as well as the items of damages I thought to be recoverable.” Such matters are “traditionally considered confidential.”
 
 (Shadow Traffic Network
 
 v.
 
 Superior Court, supra,
 
 24 Cal.App.4th at p. 1084.)
 

 
 *1482
 
 Based on the evidence, the court properly concluded Amstrad shared confidential information with the Hankin firm. But unlike in
 
 Shadow Traffic,
 
 this conclusion does not automatically give rise to the rebuttable presumption that Hankin & Co. shared Amstrad’s confidences with I&M. This differing result comes from an important factual distinction between
 
 Shadow Traffic
 
 and the instant case. In
 
 Shadow Traffic,
 
 the expert hired by defense counsel had personally participated in the confidential retention interview with plaintiff’s counsel. (24 Cal.App.4th at p. 1086.) Here, the only current members of Hankin & Co. who had met with Amstrad were Rock Hankin and Wally Jones and neither of them was retained by I&M as an expert for Western Digital. The relevant factual inquiry, then, is whether Dan Carter, the expert I&M did retain, was also exposed to Amstrad’s confidential information. The court below impliedly found that Carter was so exposed. If that factual finding is supported by substantial evidence, then the rebuttable presumption from
 
 Shadow Traffic
 
 arises that Carter shared plaintiff’s confidences with defense counsel.
 

 B.
 
 Was Dan Carter exposed to Amstrad’s confidential information?
 

 Amstrad argues the evidence supports implied findings that Carter was exposed to Amstrad’s confidential information in two ways. First, Amstrad contends Carter learned Amstrad’s confidential information from his admitted review of the Hankin & Co. draft retainer letter. Second, Amstrad contends Carter was exposed to its confidential information through a breach in the screening wall supposedly erected around Rock Hankin and Wally Jones.
 

 Western Digital, on the other hand, contends Carter was never exposed to any Amstrad confidences because the draft retainer letter contained no confidential information and the screening wall properly performed its prophylactic function.
 

 1.
 
 The draft retainer letter
 

 The court’s implied finding that the draft retainer letter contained confidential information is subject to de novo review. “ ‘[T]he interpretation of a written instrument presents a question of law to be decided de novo by an appellate court.’ [Citation.]”
 
 (Ellis
 
 v.
 
 McKinnon Broadcasting Co.
 
 (1993) 18 Cal.App.4th 1796, 1802 [23 Cal.Rptr.2d 80]; cf.
 
 Medical Operations Management, Inc.
 
 v.
 
 National Health Laboratories, Inc.
 
 (1986) 176 Cal.App.3d 886, 891 [222 Cal.Rptr. 455].)
 

 In support of its argument that the letter contains confidential information, Amstrad provides the following enumeration of the confidential
 
 *1483
 
 elements of the letter: “[T]he . . . letter reveals details of Amstrad’s theory of the case that go well beyond anything in the complaint. The letter’s list of direct costs includes costs that are not enumerated in the complaint. . . . Moreover, the letter reveals that Amstrad told Hankin a specific time period for which Amstrad seeks damages. . . . The letter also includes elements of the damages, and Amstrad’s strategy for proving damages. . . .”
 

 Western Digital argues in response that the letter contains none of Amstrad’s confidential information but rather sets forth Rock Hankin’s standard approach for calculating damages, and incorporates information concerning Amstrad’s damages claims which had already been
 
 voluntarily
 
 disclosed to Western Digital by Amstrad itself. Of course, a party’s voluntary disclosure of the content of confidential communications waives any privilege that had attached to the communications. (Evid. Code, § 912, subd. (a).)
 

 In support of its argument of waiver, Western Digital invites this court’s attention to the first amended complaint, Amstrad’s responses to special interrogatories about its damages theories, a settlement statement prepared by Amstrad for mediation of the issue of lost profits, and a series of charts and other supporting documents prepared by Amstrad for Western Digital’s insurer (and given to Western Digital) in connection with an early settlement attempt which explain in great detail Amstrad’s damage claims and theories. Our review of these documents reveals the correctness of Western Digital’s argument.
 

 For example, Amstrad contends “the letter’s list of direct costs includes costs that are not enumerated in the complaint.” Yet all of the direct costs listed in the letter (product returns, servicing costs, replacement equipment/ components, unfilled orders, headquarters and field repairs, transportation or storage charges, inventory obsolescence, ineffective promotion, extra testing) are set forth in the first amended complaint and Amstrad’s responses to the special interrogatories on damages. Likewise, Amstrad’s argument that its confidentiality has been violated because the letter reveals the specific time period for which Amstrad seeks damages is ridiculous. In its interrogatory responses Amstrad set forth its claim for lost profits based on the sales shortfall for the years 1989, 1990 and 1991—the same years mentioned in the draft retainer letter.
 

 As to Amstrad’s argument the letter reveals its confidential strategy for proving damages, the letter in fact simply mirrors the approach Amstrad has long taken in its communications with Western Digital. Simply put, Amstrad measures its lost profits by comparing the actual sales of PC 2286 with the company’s
 
 estimated
 
 sales for that new product. Amstrad’s estimated sales
 
 *1484
 
 figures for PC 2286 were “conservatively” based on the market share achieved by a sister product during the years 1986, 1987 and 1988. Amstrad not only revealed this strategy for proving lost sales in its interrogatory responses, but it illustrated it in minute detail in the charts prepared for Western Digital’s insurer.
 

 We conclude that everything of substance concerning Amstrad’s damages contained in the draft retainer letter had already been voluntarily revealed by Amstrad to Western Digital. Thus, the draft retainer letter contains nothing of a confidential nature and Carter’s review of the letter cannot be the basis for a finding he was exposed to Amstrad’s confidential information.
 

 2.
 
 The adequacy of the screening wall
 

 We must now consider whether Carter obtained Amstrad’s confidential information via a breach in Hankin & Co.’s screening wall. The court expressly found in its minute order that the screening wall at Hankin & Co. was “inadequate to provide the necessary protection for the previously disclosed confidential information. The review of Mr. Carter of the letter demonstrated this point.” In other words, the trial court found that Amstrad confidences were disclosed to Carter despite the existence of the screening wall.
 

 Significantly, the court explicitly based its finding that the wall is inadequate on the fact that Carter read the draft retainer letter. Amstrad argues he read it twice, and that one of these times was after the screening wall was purportedly erected. Of course, the “first” reading proves nothing regarding the effectiveness of the wall. Only after reading the letter did Carter and Hankin realize a conflict existed and screening was required.
 

 The evidence of a second reading is ambiguous and vigorously contested by Western Digital. Even if we assume Carter reread the letter after the wall was created, this would be an insufficient basis for finding the wall inadequate. Carter had already reviewed the letter; he could not unlearn what he had read. Moreover, we have already determined the draft retainer letter contained no confidential information. Thus Carter’s review of it, once or twice, was harmless. (See
 
 Mills Land & Water Co.
 
 v.
 
 Golden West Refining Co.
 
 (1986) 186 Cal.App.3d 116, 134 [230 Cal.Rptr. 461] [only conduct that will have a continuing prejudicial effect on the litigation justifies disqualification; “[disqualification must be
 
 necessary.”].)
 
 Indeed, the purpose of the wall was not to screen Carter from harmless material he already reviewed, but rather to prevent Rock Hankin and Wally Jones from consciously or unconsciously revealing to Carter and his team any confidential information they learned from their meetings with Amstrad.
 

 
 *1485
 
 In determining whether the record supports a finding that Hankin and Jones shared Amstrad’s confidences with Carter, the rebuttable presumption of disclosure recognized by the court in
 
 Shadow Traffic Network
 
 v.
 
 Superior Court, supra,
 
 24 Cal.App.4th 1067, comes into play. The court in
 
 Shadow Traffic
 
 held that when a law firm retains an expert witness previously interviewed by opposing counsel and exposed to the other side’s confidential information, a rebuttable presumption arises that the expert disclosed that confidential information to the counsel that subsequently hired him or her.
 
 (Id.
 
 at p. 1085.)
 

 The factual twist in the instant case is that I&M did not hire the experts previously interviewed by Amstrad’s counsel; instead, I&M hired their coworker. Applying the rule of
 
 Shadow Traffic
 
 to these facts, we hold that I&M’s retention of Carter gave rise to a rebuttable presumption that Hankin and Jones disclosed Amstrad’s confidential information to him.
 

 Shadow Traffic
 
 explains the effect of this rebuttable presumption. “As the purpose of this presumption is to implement the public policy of protecting confidential communications, the presumption is one affecting the burden of proof. (Evid. Code, § 605.) The effect of this type of presumption ‘is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact.’ (Evid. Code, § 606.) This means that because the trial court had first found the basic fact that gave rise to the presumption [opposing counsel gave confidential information to the expert], it had to find the presumed fact [the expert disclosed this confidential information to the law firm that retained the expert] unless it was persuaded by a preponderance of the evidence of the nonexistence of the presumed fact. (Appen. C to CALJIC (7th ed. 1986) pp. 336-337.)”
 
 (Shadow Traffic Network
 
 v.
 
 Superior Court, supra,
 
 24 Cal.App.4th at p. 1085.)
 

 In other words, Western Digital had the burden of proving by a preponderance of the evidence that Hankin and Jones did not disclose Amstrad’s confidential information to Carter or the members of the Carter team. Western Digital presented such proof by way of declarations from Hankin, Jones, Carter and every Carter team member. For example, Hankin states in his declaration: “Immediately after learning that Irell & Manella wanted to hire Dan Carter, I directed Dan Carter that Wally [Jones] and I were not to be involved in any work done relating to this matter, nor are we to be privy to any discussions or conversations about it. This wall between Wally Jones and me . . .on the one hand, and the Carter Team, on the other, has been scrupulously observed. . . . From the time that Dan Carter was approached by Irell & Manella in connection with this matter, I have been careful not to discuss the substance of the case with any other members of
 
 *1486
 
 my firm. I have not directly or indirectly communicated to any person on the Carter Team anything that was discussed with me at my meetings with [Amstrad’s counsel] and no member of the Carter Team has ever asked me to do so. ... [H I have never discussed this case with any attorney from Irell & Manella, nor with any person known to me (or even suspected by me) to be affiliated with Western Digital.”
 

 Jones’s declaration similarly attests to his lack of communication “with anyone at Hankin & Co. concerning Amstrad or Western Digital or my meetings with [Amstrad’s counsel], . . .[HI have never discussed this case with any attorney from Irell & Manella, nor with any person . . . affiliated with Western Digital.” According to Carter’s declaration, Hankin told him “nothing of the substance” of Hankin’s meetings with Amstrad. He further declares, “I have never been privy to any Amstrad confidential information. Neither Rock Hankin nor Wallace Jones has ever discussed with me anything they may have learned in the beauty contest process with Amstrad.”
 

 The declaration of each member of the Carter team contains the following statement: “I have never spoken to anyone about or been told about, directly or indirectly, anything at all having to do with what was discussed at a meeting or meetings between Rock Hankin and Wally Jones . . . and [Amstrad’s counsel]. ... I have been informed about the importance of my not discussing our efforts for Irell & Manella or Western Digital with Mr. Hankin or Mr. Jones or anyone else that I kn,ow or believe spoke to [Amstrad’s counsel] about the dispute between Amstrad and Western Digital. ... I have not had any such conversations or communications with any such persons and will not do so in the future.”
 

 Amstrad faced an uphill battle in refuting these declarations. Lacking direct evidence that Hankin or Jones ever revealed any of Amstrad’s confidential information to Carter, Amstrad built its case on inferences alone. For example, Amstrad makes much of the fact that Carter admits in his declaration to having invited Rock Hankin to come to his initial meeting with Ms. Greene of I&M “for marketing purposes.” (Carter explains he thought Hankin’s presence would be “beneficial” as this was Carter’s first experience as an expert witness.) Though Greene told Carter before the meeting not to have Hankin attend because she “did not need a marketing pitch,” Amstrad argues Carter’s plan to bring Hankin along is a basis for inferring Hankin disclosed Amstrad’s confidences to Carter as part of their joint meeting preparation. Amstrad asserts that “it strains credulity to suggest that Messrs. Hankin and Carter did not discuss the substance of the case at a time when they jointly planned to attend a meeting where they expected to make a sales pitch and hoped to be retained.”
 

 
 *1487
 
 The inference suggested by Amstrad must be
 
 reasonable
 
 if it is to serve as substantial evidence for a finding that Amstrad’s confidences were disclosed to Carter. “[A] judgment may be supported by inference, but the inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork. [Citation.] Thus, an inference cannot stand if it is unreasonable when viewed in light of the whole record. [Citation.]”
 
 (Beck Development Co.
 
 v.
 
 Southern Pacific Transportation Co.
 
 (1996) 44 Cal.App.4th 1160, 1204 [52 Cal.Rptr.2d 518].) “[A] trier of fact may not indulge in inferences rebutted by clear, positive and uncontradicted evidence. [Citation.]”
 
 (Fullerton Union High School Dist.
 
 v.
 
 Riles
 
 (1983) 139 Cal.App.3d 369, 383 [188 Cal.Rptr. 897].)
 

 The record contains direct evidence by way of declarations from Carter and Hankin establishing that the two never discussed the substance of the case. Amstrad’s suggestion that the two did engage in such a discussion in advance of Carter’s first meeting with Greene is based on nothing but suspicion and conjecture. It is thus an unreasonable inference and cannot support a finding Hankin disclosed Amstrad’s confidential information to Carter.
 

 Amstrad offers as additional “objective evidence” that Carter was exposed to Amstrad confidences the fact that all five members of the Carter team work with Hankin and Jones in the same “small” office of sixteen professionals. Also, according to Amstrad, “[a]ccess to the file room is unrestricted, and the Amstrad files were not secured in any way.” But Amstrad’s contention that Carter’s exposure to its confidential information can be inferred from the size of his office and the unrestricted nature of the office file room is once again based on suspicion and conjecture. Given the record, it is simply unreasonable to infer Carter was actually exposed to confidential information simply because he had
 
 access
 
 to that information.
 

 Disqualification of an expert (and, by extension, the law firm that retained the expert) can only be justified where the moving party establishes the expert actually “possesses confidential attorney-client information materially related to the proceedings before the court.”
 
 (In re Complex Asbestos Litigation, supra,
 
 232 Cal.App.3d at p. 596.) The court in
 
 In re Complex Asbestos Litigation
 
 specifically cautioned “that showing merely potential access to confidences without actual exposure is insufficient. The threat to confidentiality must be real, not hypothetical.”
 
 (Ibid.
 
 at fn. 13; see also
 
 Mills Land & Water Co.
 
 v.
 
 Golden West Refining Co., supra,
 
 186 Cal.App.3d at pp. 135-136.)
 

 
 *1488
 
 Finally, Amstrad argues Carter’s exposure to its confidential information can be inferred from the fact that there was “no memorandum memorializing or referring to the creation of any [ethical screening] wall. Nor was an oral announcement of such a wall ever made . ...” In other words, Amstrad complains of a lack of formality in the screening process at Hankin & Co. Yet
 
 In re Complex Asbestos Litigation
 
 does not require formal screening. “ ‘It is
 
 a
 
 means, but not
 
 the
 
 means, of rebutting the presumption of shared confidences.’ [Citation.]”
 
 (In re Complex Asbestos Litigation, supra,
 
 232 Cal.App.3d at p. 594, original italics.) Rather, case law requires a showing “that the practical effect of formal screening has been achieved. The showing must satisfy the trial court that the [individual exposed to the other side’s confidences] has not had and will not have any involvement with the litigation, or any communication with attorneys or coemployees concerning the litigation, that would support a reasonable inference that the information has been used or disclosed.”
 
 (Id.
 
 at p. 596.)
 

 Admittedly, it is not the province of a reviewing court to “reweigh the evidence or substitute our deductions for those of the trial court.”
 
 (Shadow Traffic Network
 
 v.
 
 Superior Court, supra,
 
 24 Cal.App.4th at p. 1087.) But where there is
 
 no evidence
 
 to support an implied finding, we must intervene. We find Amstrad presented no evidence the screening wall at Hankin & Co. was breached. On the other hand, we find Western Digital submitted an abundance of evidence by way of declarations from all relevant persons establishing that the “practical effect of formal screening” has been achieved at Hankin & Co. We conclude that the experts retained by Western Digital (Carter and his team) possess no confidential information obtained from Amstrad. Consequently, the trial court abused its discretion in ordering the disqualification of Hankin & Co. and of I&M.
 

 It should be noted that I&M bears some fault in this matter for not immediately and forthrightly disclosing to Amstrad Western Digital’s intent to retain an expert from the Hankin firm, once the possibility of a conflict of interest from such employment became apparent.
 
 (Shadow Traffic Network
 
 v.
 
 Superior Court, supra,
 
 24 Cal.App.4th at p. 1082, fn. 10.) Moreover, Ms. Greene would have been wise to instruct Carter to distribute a memorandum to all Hankin & Co. personnel announcing the creation of a screening wall around Hankin and Jones for the Western Digital/Amstrad matter. While the failure to take these steps may be justly criticized, such failure does not justify disqualification of the expert or of counsel.
 

 A peremptory writ of mandate shall issue directing the superior court to vacate its order granting the motion to disqualify I&M and Hankin & Co.
 
 *1489
 
 and to enter a new order denying the motion to disqualify.
 
 [3]
 
 The alternative writ is discharged and the stay is dissolved. Western Digital is entitled to its costs in this proceeding.
 

 Sonenshine, J., and Rylaarsdaam, J., concurred.
 

 A petition for a rehearing was denied February 19, 1998, and the opinion was modified to read as printed above.
 

 [1]
 

 The expert had already withdrawn from the case. The court indicated that something less than disqualification of the entire law firm could have been ordered had defendant proven that only certain lawyers in the firm had been exposed to plaintiff’s confidences. Defendant failed to make such a showing and lost the services of the entire firm.
 
 (Shadow Traffic Network
 
 v.
 
 Superior Court, supra,
 
 24 Cal.App.4th at p. 1088.)
 

 [2]
 

 Of course, this factual dispute over whether Amstrad’s interviews with Hankin & Co. were cloaked in confidence could have been avoided had Amstrad obtained at the outset the consulting firm’s written agreement to maintain the confidentiality of any information disclosed during the meetings. As the court noted in
 
 Shadow Traffic,
 
 “[A] formal confidentiality agreement prohibiting the disclosure of any information learned by the expert during the . . . meeting would have been a better practice because the agreement would have eliminated many of the factual disputes in this case[.]”
 
 (Shadow Traffic Network
 
 v.
 
 Superior Court, supra,
 
 24 Cal.App.4th at p. 1083.) While we abide by
 
 Shadow Traffic's
 
 holding that “the absence of such an agreement is not fatal”
 
 (ibid.), we
 
 believe the wiser policy would be to require such a document as proof of the confidential nature of an attorney’s interview with an expert who was not retained. The existence of such a document would not only “eliminat[e]. . . factual disputes”
 
 (ibid.),
 
 but also serve as fair warning to the interviewee that the attorney intends to disclose confidential information during the interview and that such disclosure would disqualify the expert from employment by the opposing party should the interviewing attorney not retain the expert. This would give the expert the opportunity to decline to accept any disclosures.
 

 [3]
 

 This order is made without prejudice to the trial court’s issuing any order it deems appropriate to ensure the continued integrity of the ethical wall prohibiting Messrs. Hankin and Jones from disclosing Amstrad’s confidential information to the Carter team.