[No. G021136. Fourth Dist., Div. Three. Feb. 16, 1999.]

STRASBOURGER PEARSON TULCIN WOLFF INC., et al., Plaintiffs and Appellants, v.
WIZ TECHNOLOGY, INC., Defendant and Respondent.

## COUNSEL

Stroock & Stroock & Lavan, Michael F. Perlis, Judith L. Anderson, Mary D. Manesis and Michael H. Chang for Plaintiffs and Appellants.

Rosen & Associates and Robert C. Rosen for Defendant and Respondent.

## OPINION

**WALLIN, J.**—Strasbourger Pearson Tulcin Wolff Inc., Michael J. Schumacher, and Allan M. Levine (collectively Strasbourger) appeal the order disqualifying Stroock & Stroock & Lavan and Michael F. Perlis, a member of the firm (collectively Stroock), from representing Strasbourger in the action below, claiming the trial court abused its discretion because: (1) Stroock's representation caused, at most, the mere appearance of impropriety; (2) Stroock represented Strasbourger, the underwriter in Wiz Technology, Inc.'s (Wiz) stock offering, and never represented Wiz; (3) even if Stroock technically represented Wiz, the trial court failed to determine whether a substantial relationship existed; (4) Wiz had no reasonable expectation any of the information it gave to Stroock would be kept confidential;

(5) Stroock's representation of Wiz's former auditors did not give rise to a duty of confidentiality to Wiz; and (6) the trial court failed to consider that Wiz's motion to disqualify Stroock was tardy and brought solely for tactical purposes. . We reverse.[1]

Strasbourger, an investment banking firm, served as an underwriter for Wiz's public stock offering. It purchased 1,820,000 shares of Wiz stock for resale to the public. Stroock, Strasbourger's usual corporate counsel, participated in the process by preparing the registration statement, prospectus, and certain regulatory filings, performing a due diligence investigation concerning the correctness of Wiz's representations, and involving itself in the negotiation of an underwriting agreement and a warrant agreement which governed the transaction. Stroock also worked to qualify the stock under the "blue sky" laws of states where the securities were to be sold, and filed necessary materials with the National Association of Stock Dealers. To perform its functions, some of Stroock's lawyers met several times with personnel working for Wiz, which provided the lawyers with information concerning these matters.

The underwriting agreement provided Wiz would pay the attorney fees for its counsel and Strasbourger. Hand & Hand was listed in the agreement as Wiz's counsel and Stroock was listed as Strasbourger's. The prospectus noted Hand & Hand would pass on the shares' legality and Stroock would pass on certain legal matters for Strasbourger. Wiz paid Stroock's bill of $23,666.05 for the blue sky work, as itemized in its statement to Wiz.

About a year and a half later, Wiz engaged Coopers & Lybrand (Coopers) as auditors. To enable Coopers to do its job, Wiz disclosed financial and other information regarding every aspect of its business, activities, and operations, including accounting and management issues. Wiz also discussed the specifics of an SEC (Securites and Exchange Commission) investigation with Coopers. During this time, Stroock was legal counsel for Coopers, while it was also Strasbourger's counsel. Coopers eventually resigned as Wiz's auditors, which Wiz asserted caused its stock value and ability to raise funds to decline. Wiz believed Stroock played a part in Coopers's resignation.

---

[1]Preliminarily, Wiz suggests the disqualification order is not appealable. Not so. It is appealable, at least, as an order granting an injunction. (*In re Lee G.* (1991) 1 Cal.App.4th 17, 25, fn. 4 [1 Cal.Rptr.2d 375]; *Vivitar Corp.* v. *Broidy* (1983) 143 Cal.App.3d 878, 881 [192 Cal.Rptr. 281]; *Chronometrics, Inc.* v. *Sysgen, Inc.* (1980) 110 Cal.App.3d 597, 599, fn. 1 [168 Cal.Rptr. 196]; and see *Conservatorship of Rich* (1996) 46 Cal.App.4th 1233, 1236 [54 Cal.Rptr.2d 459].) On the merits, we will conclude Strasbourger's second and fifth arguments have merit and mandate reversal, obviating the need to consider the others.

Several months later, Strasbourger sued Wiz for allegedly breaching the underwriting agreement by selling shares of its stock on its own, and breaching the warrant agreement by failing to register the shares. Wiz eventually brought a motion to disqualify Stroock from representing Strasbourger on the grounds Stroock had a conflict of interest because it represented Wiz in the stock qualification process and represented Coopers while it served as Wiz's auditor. The court granted the motion.

## I

Strasbourger contends Stroock's disqualification was erroneous because Stroock represented Strasbourger and never represented Wiz in the stock transaction. ▮▮ We review the trial court's ruling using the abuse of discretion standard. (*In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 585 [283 Cal.Rptr. 732].) In exercising its discretion, the trial court must make a reasoned judgment that complies with applicable legal principles and policies. (*Henriksen* v. *Great American Savings & Loan* (1992) 11 Cal.App.4th 109, 113 [14 Cal.Rptr.2d 184].)

The disqualification issue impacts each party's concerns, such as the right to counsel of choice, and professional ethical considerations, such as client confidentiality and trust. It also implicates public trust " 'in the scrupulous administration of justice and the integrity of the bar.' " (*Metro-Goldwyn-Mayer, Inc.* v. *Tracinda Corp.* (1995) 36 Cal.App.4th 1832, 1838 [43 Cal.Rptr.2d 327], italics omitted.) The importance of a disqualification motion mandates a careful review of the trial court's exercise of discretion. (*Ibid.*; see also *Western Digital Corp.* v. *Superior Court* (1998) 60 Cal.App.4th 1471, 1480 [71 Cal.Rptr.2d 179].)

In deciding whether the trial court abused its discretion, "[w]e are . . . bound . . . by the substantial evidence rule. [Citations.] . . . The judgment of the trial court is presumed correct; all intendments and presumptions are indulged to support the judgment; conflicts in the declarations must be resolved in favor of the prevailing party, and the trial court's resolution of any factual disputes arising from the evidence is conclusive. [Citations.]" (*In re Marriage of Zimmerman* (1993) 16 Cal.App.4th 556, 561-562 [20 Cal.Rptr.2d 132].) We presume the court found in Wiz's favor on all disputed factual issues. (*Responsible Citizens* v. *Superior Court* (1993) 16 Cal.App.4th 1717, 1734 [20 Cal.Rptr.2d 756].)

▮▮ The trial court's disqualification order was grounded on rule 3-310(E) of the Rules of Professional Conduct of the State Bar, which provides: "A member shall not, without the informed written consent of the

client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment." (See *In re Marriage of Zimmerman, supra,* 16 Cal.App.4th at pp. 562-563 [invoking the rule].) An attorney-client relationship must have existed before disqualification is proper. (See *Responsible Citizens* v. *Superior Court, supra,* 16 Cal.App.4th at p. 1723 [considering the attorney-client relationship as determinative].)

█ The court in *Responsible Citizens* v. *Superior Court, supra,* 16 Cal.App.4th 1717 set forth the appropriate standards for determining whether an attorney-client relationship existed: " 'Except for those situations where an attorney is appointed by the court, the attorney-client relationship is created by some form of contract, express or implied, formal or informal. [Citation.]' [Citations.] . . . [¶] 'An implied contract is one, the existence and terms of which are manifested by conduct.' [Citation.] 'The distinction between express and implied in fact contracts relates only to the manifestation of assent; both types are based upon the expressed or apparent intention of the parties.' [Citation.] [¶] . . . [¶] . . . [I]n determining whether an attorney-client relationship exists . . . primary attention should be given to whether the totality of the circumstances, including the parties' conduct, implies an agreement by the . . . attorney not to accept other representations adverse to the [putative client's] personal interests. (See Friedman, *The Creation of the Attorney-Client Relationship: An Emerging View* [(1986)] 22 Cal. W[estern] L.Rev. [209,] 231 suggesting that one of the most important facts involved in finding an attorney-client relationship is 'the expectation of the client based on how the situation appears to a reasonable person in the client's position.') [¶] . . . [¶] The question of whether an attorney-client relationship exists is one of law. [Citation.] However, when the evidence is conflicting, the factual basis for the determination must be determined before the legal question is addressed. [Citation.]" (*Id.* at pp. 1732-1733, italics omitted.) In deference to the trial court's presumed findings, factual disputes are resolved in Wiz's favor. (*Id.* at p. 1734.) With these principles in mind, we review the evidence.

█ Wiz asserts we need only review Stroock's billing to Wiz to affirm the appeal. But payment of attorney fees alone does not determine an attorney-client relationship; it is merely a factor. (*Lasky, Haas, Cohler & Munter* v. *Superior Court* (1985) 172 Cal.App.3d 264, 285 [218 Cal.Rptr. 205].) The underwriting agreement, which Wiz signed, and the prospectus rebut any inference arising from the billing. In both, Stroock was named as Strasbourger's attorneys, and Hand & Hand was listed as Wiz's attorneys.

The underwriting agreement provided Wiz would pay Stroock's fees for the blue sky compliance. Nothing in the record indicates the billing or payment was based on a relationship other than that set forth in the agreement—Wiz was to pay Strasbourger's lawyers.

Any inference to the contrary is rebutted by the habit and custom of parties in stock underwriting transactions. The company traditionally pays for the blue sky work done by the underwriter's counsel. (See 2A Haft, Venture Capital and Small Business Financings (1991) § 5A.01 p. 5A-3 et seq.; Bloomenthal, Going Public Handbook (1996 ed.) § 3.12(3), (5), pp. 3-77 to 3-78.) A savvy company involved in a stock offering would not consider the underwriter's counsel to be its attorney simply because it performed blue sky work for the transaction.[2]

Wiz asserts *International Tele-Marine* v. *Malone & Associates* (D.Colo. 1994) 845 F.Supp. 1427 compels a contrary conclusion. The case involved a stock offering with an underwriting agreement under which the underwriter's counsel was to perform functions similar to those Stroock performed, and the company was to pay the underwriter's counsel for its blue sky work. (*Id.* at pp. 1431-1432.) The company and the underwriter's counsel entered into another agreement, however. That agreement was consistent with the underwriting agreement in some respects but also referred to " 'withdraw[al] as *counsel for* [*the company*].' " The court found that language could be construed as creating an attorney-client relationship and denied summary judgment. (*Id.* at pp. 1432-1433.) Nothing in *International Tele-Marine* mandates a finding the evidence here was sufficient to establish an attorney-client relationship, particularly in the absence of any express representation by Stroock. Indeed, the *International Tele-Marine* court noted the mere performance of blue sky work in an offering does not create an attorney-client relationship between the underwriter's counsel and the issuing company. (*Ibid.*)

Wiz also relies heavily on *Jack Eckerd Corp.* v. *Dart Group Corp.* (D. Del. 1985) 621 F.Supp. 725. In *Eckerd*, Dart wanted to obtain shares in another company, but wanted to avoid the restrictions inherent in being labeled an "investment company" under the Investment Company Act of 1940. It hired First Boston Corporation, an investment banking firm, to advise it. First Boston obtained the services of Fried, Frank, Harris, Shriver & Jacobson (Fried, Frank) in connection with the work. Fried, Frank received permission from Dart's regular outside counsel to confer with Dart. One of Fried,

---

[2] Jehu Hand, of Hand & Hand, Wiz's counsel, has "considerable background and expertise in securities law matters."

Frank's attorneys obtained information from Dart and prepared a complex memorandum discussing the issue. By agreement with First Boston, Dart paid Fried, Frank's fee. When Jack Eckerd Corporation sued Dart later on a substantially related matter, Dart sought to have Fried, Frank disqualified as Eckerd's counsel. (*Id.* at pp. 728-730.) The district court granted the motion, finding there had been at least an implied attorney-client relationship between Fried Frank, and Dart. (*Id.* at pp. 731-732.)

Although the fact situations of *Eckerd* and this case are similar, the distinctions mandate a different result. No agreement, like the one here, designated Fried, Frank as First Boston's counsel. To the contrary, First Boston was required to obtain Dart's approval of the counsel First Boston obtained for the work. (621 F.Supp at p. 732.) Indeed, the district court in *Eckerd* found First Boston acted as Dart's agent in obtaining Fried, Frank. (*Id.* at p. 733.) And, unlike the blue sky work here, which inured to Strasbourger's benefit, the memorandum Fried, Frank prepared affected only Dart's interests. (*Id.* at p. 732.)

Despite this lack of support from out-of-state federal district court cases, Wiz points to several factors it claims supported the trial court's conclusion Stroock represented Wiz. Wiz's president, Arthur Tendler, submitted a declaration stating Stroock "advised Wiz in connection with [blue sky issues]," and Tendler "had numerous contacts with Stroock lawyers . . . in connection with these matters." Wiz's lawyer, Hand, offered a declaration asserting Stroock "directly represented WIZ in connection with blue sky state securities registrations; matters involving the National Association of Securities Dealers, Inc.; matters involving the U. S. Securities & Exchange Commission; and matters involving the American Stock Exchange." Hand also alleged Stroock "came into possession of confidential and proprietary WIZ information," which could be measured by "everything that WIZ told to Stroock, less only that information that was publicly disclosed in regulatory filings . . . ." Hand alluded to Stroock's due diligence work as a primary source of the information.[3]

In light of the express underwriting terms and the normal practices in stock offerings through underwriters, these facts do not rise to the level of substantial evidence Stroock represented Wiz. Tendler made the conclusory statement Stroock advised Wiz on the blue sky issues, but he gave no particulars. Hand appended a letter from a Stroock legal assistant that he

---

[3]Wiz also mentions the opinion of its experts as a basis for concluding Stroock represented Wiz, but the experts never addressed that issue. Instead, they *assumed* the representation as part of the facts they used to conclude the representation was improper.

claimed supported the assertion Stroock represented Wiz. The letter merely "advised" Wiz it needed to send the Pennsylvania Securities Division originals of certain documents instead of copies, or the Pennsylvania Securities Commission would issue a stop order on issuance of the stock.

This flimsy "evidence" speaks volumes. The only reasonable inference that can be drawn from it is Stroock's advice to Wiz was limited to perfunctory instructions necessary for blue sky compliance. It is not the type of evidence that connotes attorney representation.

Hand's declaration asserts Stroock represented Wiz on matters other than blue sky compliance involved in the offering. Notably absent from Wiz's evidence is a bill from Stroock for any other alleged work. We cannot believe Stroock would represent Wiz in these other matters on a pro bono basis. No rational trier of fact could conclude Wiz *reasonably* believed Stroock did.

Hand also appended to his declaration a letter from the Pennsylvania Securities Commission to Wiz that Hand claimed showed a Stroock attorney represented he was counsel for Wiz. But the letter merely refers to the attorney as "counsel representing the Wiz *Offering* before the Commission." (Italics added.) Even if we assume the letter's author had personal knowledge on that point, the letter does not show Stroock, or any firm members, ever held itself out as Wiz's attorney.

As Strasbourger correctly notes, Wiz apparently bases at least part of its argument Stroock represented it on its misperceptions that Wiz designated the states where the offering was to be made, and that Wiz was responsible for blue sky compliance. Pursuant to the underwriting agreement Strasbourger designated the states where offerings would be made. This made sense because Strasbourger made a "firm commitment" to purchase all the stock in the offering, making Strasbourger solely responsible for its resale. (See Loss & Seligman, Securities Regulation (3d ed. 1989) p. 324.)

Wiz also errs by assuming it was solely responsible for blue sky compliance. The Uniform Securities Act, which many states have adopted, mandates registration of securities, but does not specify who must register them. (7B West's U. Laws Ann. (1985) U. Securities Act § 414(a); see Loss & Seligman, Securities Regulation, *supra,* at pp. 98-99.) The registration may be filed "by the issuer, any other person on whose behalf the offering is to be made, or a registered broker-dealer [licensed under this Act]." (7B West's U. Laws Ann., *supra*, U. Securities Act § 305(a).) Typically, when an underwriting broker-dealer, like Strasbourger, purchases shares for resale, the

underwriting agreement provides the underwriter's counsel will qualify the offering in each state where the underwriter wishes to make resales, as Stroock did. (See, e.g., 2A Haft, Venture Capital and Small Business Financings, *supra,* § 5A.01, p. 5A-3 et seq.; Bloomenthal, Going Public Handbook, *supra,* at pp. 3-77 to 3-78.) The usual industry practice coupled with the underwriting agreement precluded Wiz from reasonably believing it was responsible for blue sky compliance or that Stroock represented it in the registration work.

Two other factors reinforce the conclusion Stroock represented only Strasbourger in the blue sky compliance work and Wiz could not have reasonably believed otherwise: Strasbourger faced penalties if the offering was not properly registered and it had to perform a due diligence investigation to avoid liability for misstatements concerning the offering. As the broker-dealer in a firm commitment underwriting, Strasbourger was subject to disciplinary action if it sold unregistered securities. (See, e.g., 7B West's U. Laws Ann., *supra,* U. Securities Act § 204; Corp. Code, § 25212.) Strasbourger had the responsibility to ensure the stock offering was properly registered in each jurisdiction in which shares were to be sold. (See Loss & Seligman, Securities Regulation, *supra,* at pp. 92-133; Bloomenthal, Going Public and the Public Corporation (1992) 9a-11 to 9a-13, 9a-22 to 9a-42.)

Concerning due diligence, under the Securities Act of 1933, an underwriter is liable for any material misstatements in the registration statement. (15 U.S.C. § 77k (a).) The underwriter has a defense to such a claim if it can show it performed a reasonable investigation to ensure all necessary disclosures were made and were true. (15 U.S.C. § 77k(b)(3); and see *In re Software Toolworks Inc.* (9th Cir. 1994) 38 F.3d 1078, 1083.) As Hand noted in his declaration, Stroock performed due diligence work for the offering. Hand asserted the work was done for Wiz, but 15 United States Code section 77k(b)(3) does not provide a due diligence defense for the stock issuer. Stroock could only have been doing the work for Strasbourger and Wiz could not have reasonably believed otherwise.[4] Nor could Wiz reasonably believe Stroock represented Wiz or that information Wiz gave Stroock would be kept confidential.

We do not lightly reject the trial court's implied findings, but all of the evidence suggested Stroock was Strasbourger's counsel during the offering, and none of the evidence except Wiz's unsupported conclusions and assumptions suggested the contrary. (See *Western Digital Corp.* v. *Superior Court,*

---

[4]We find nothing in the record suggesting Stroock ever affirmatively represented to Wiz anything to the contrary.

*supra*, 60 Cal.App.4th at p. 1487 [disqualification order reversed; suspicion and conjecture cannot support a ruling when all evidence is to the contrary].) Wiz did not show the requisite attorney-client relationship to disqualify Stroock from the case.[5]

II

Strasbourger claims Stroock's representation of Wiz's former auditors did not give rise to a duty of confidentiality to Wiz. Wiz grounded its motion to disqualify Stroock, in part, on that representation, and the trial court may have based its ruling on it.

Wiz's argument on this point is not entirely clear. Wiz refers to a pronouncement concerning auditor-client confidentiality contained in the Statements of Auditing Standards issued by the Auditing Standards Board of the American Institute of Certified Public Accountants. We presume Wiz does not argue for an auditor-client privilege since that contention has been soundly rejected. (See *Couch* v. *United States* (1973) 409 U.S. 322, 335 [93 S.Ct. 611, 619, 34 L.Ed.2d 548]; and see *United States* v. *Arthur Young & Co.* (1984) 465 U.S. 805, 817-818 [104 S.Ct. 1495, 1502-1503, 79 L.Ed.2d 826] [no accountant-client privilege for tax accrual work papers]; *Fisher* v. *United States* (1976) 425 U.S. 391 [96 S.Ct. 1569, 48 L.Ed.2d 39] [no inherent self-incrimination privilege for communications to accountant].) Instead, it appears Wiz asserts Stroock, as its former counsel, had a duty to maintain Wiz's confidences with Coopers. Wiz errs in its premise. As we explained, Stroock never represented Wiz.

Wiz also appears to contend Stroock had a duty to Wiz independent of any prior attorney-client relationship. To make this argument, Wiz relies heavily on *In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d 572, where the Court of Appeal upheld the disqualification of a law firm that hired a paralegal who had obtained attorney-client confidential information when he worked for the opposing party's lawyers. (*Id.* at pp. 580-585, 599.) Wiz stresses the disqualified firm never had an attorney-client relationship with the opposing party and argues for the same result.

But the *Complex Asbestos Litigation* court emphasized that its analysis "does not mean that there is or should be any broad duty owed by an

---

[5]Because we reach this conclusion, we need not address Strasbourger's argument the trial court erred by failing to show on the record it considered proper factors when it ruled on the motion. (See *Smith, Smith & Kring* v. *Superior Court* (1997) 60 Cal.App.4th 573, 582 [70 Cal.Rptr.2d 507] [". . . trial judges must indicate on the record they have considered the appropriate factors and make specific findings of fact when weighing the conflicting interests involved in recusal motions."].)

attorney to an opposing party to maintain that party's confidences in the absence of a prior attorney-client relationship. The imposition of such a duty would be antithetical to our adversary system and would interfere with the attorney's relationship with . . . clients. The courts have recognized repeatedly that attorneys owe no duty of care to adversaries in litigation or to those with whom their clients deal at arm's length. [Citations.] Instead, we deal here with a prophylactic rule necessary to protect the confidentiality of the attorney-client relationship and the integrity of the judicial system, and with the appropriate scope of the remedy supporting such a rule." (232 Cal.App.3d at p. 588.)

In reaching that conclusion, the court distinguished *Maruman Integrated Circuits, Inc.* v. *Consortium Co.* (1985) 166 Cal.App.3d 443 [212 Cal.Rptr. 497] and *Cooke* v. *Superior Court* (1978) 83 Cal.App.3d 582 [147 Cal.Rptr. 915], which rejected the disqualification of attorneys who obtained the opposing party's confidential information from their own clients. (*In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at pp. 589-591.) The *Complex Asbestos Litigation* court reasoned, "Mere exposure to the confidences of an adversary does not, standing alone, warrant disqualification. Protecting the integrity of judicial proceedings does not require so draconian a rule. Such a rule would nullify a party's right to representation by chosen counsel any time inadvertence or devious design put an adversary's confidences in an attorney's mailbox. . . . [¶] . . . [¶] The salient fact that distinguishes the present appeal from *Maruman* and *Cooke* is the person who disclosed the adverse party's attorney-client communications. If the disclosure is made by the attorney's own client, disqualification is neither justified nor an effective remedy. A party cannot 'improperly' disclose information to its own counsel in the prosecution of its own lawsuit. Even if counsel were disqualified, the party would be free to give new counsel the information, leaving the opposing party with the same situation. [Citation.]" (*In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at pp. 589-591.)

That reasoning and the balance of the court's discussion reveals the *Complex Asbestos Litigation* court fashioned a rule of disqualification clearly limited to cases where employees or agents of attorneys go to work for opposing counsel and bring confidential *attorney-client* information with them. (232 Cal.App.3d at pp. 587-596.)[6] Wiz's case is distinguishable. As in *Maruman Integrated Circuits, Inc.* v. *Consortium Co., supra,* 166 Cal.App.3d

---

[6]At Wiz's invitation, we have reviewed several cases it asserts "[c]onfirm[] the holding of [*Complex Asbestos Litigation*]." Nothing in any of them alters our interpretation of the case. All of them involved a current or prior attorney-client relationship between the attorneys for whom disqualification was sought and the party seeking disqualification. None of them cited *Complex Asbestos Litigation*, if at all, for the proposition disqualification can be had absent an

443 and *Cooke* v. *Superior Court, supra,* 83 Cal.App.3d 582, any information Stroock obtained concerning the Coopers audit came from its client, Coopers. As such, it could not form the basis for disqualification. (*Maruman Integrated Circuits, Inc.* v. *Consortium Co., supra,* 166 Cal.App.3d at pp. 447-451; *Cooke* v. *Superior Court, supra,* 83 Cal.App.3d at pp. 590-592.)[7]

The order disqualifying Stroock is reversed. Strasbourger is entitled to its costs on appeal.

Sills, P. J., and Sonenshine, J., concurred.

Respondent's petition for review by the Supreme Court was denied May 19, 1999.

---

attorney-client relationship. Indeed, most of the cases pre-dated *Complex Asbestos Litigation,* so they could hardly "confirm" its holding. (See *Henriksen* v. *Great American Savings & Loan, supra,* 11. Cal.App.4th at pp. 112-114; *Truck Ins. Exchange* v. *Fireman's Fund Ins. Co.* (1992) 6 Cal.App.4th 1050, 1056 [8 Cal.Rptr.2d 228]; *Rosenfeld Construction Co.* v. *Superior Court* (1991) 235 Cal.App.3d 566, 575 [286 Cal.Rptr. 609]; *Western Continental Operating Co.* v. *Natural Gas Corp.* (1989) 212 Cal.App.3d 752, 758-759 [261 Cal.Rptr. 100]; *River West, Inc.* v. *Nickel* (1987) 188 Cal.App.3d 1297, 1302-1303 [234 Cal.Rptr. 33]; *Elliott* v. *McFarland Unified School Dist.* (1985) 165 Cal.App.3d 562, 569, fn. 6 [211 Cal.Rptr. 802]; *Grove* v. *Grove Valve & Regulator Co.* (1963) 213 Cal.App.2d 646, 652-653 [29 Cal.Rptr. 150].)

[7]Because we reach our result on this ground, we do not decide whether Coopers had any professional duty to keep the information in question confidential or whether the information was substantially material to this litigation.