Filed 4/16/15  Brown v. Zive CA2/5

## **NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CHERIE BROWN,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>YOUVAL ZIVE et al.,<br><br>    Defendants and Appellants. | B250561<br><br>(Los Angeles County Super. Ct.<br>No. BC440484) |

    APPEAL from a judgment and orders of the Superior Court of Los Angeles County, Victor E. Chavez, Judge.  Affirmed in part, reversed in part, and remanded.

    Cheong, Denove, Rowell & Bennett, John D. Rowell, for Plaintiff and Appellant.

    Law Offices of Ilene Kurtzman, Ilene Kurtzman, Andrea Breuer, for Defendants and Appellants.

_____

Defendants and appellants Youval Zive and VACA Partnership (VACA), of which Zive was a partner (collectively appellants), sold a home to plaintiff and respondent, Cherie Brown. Brown brought several claims against Zive and VACA, including fraud, negligent misrepresentation, and failure to disclose seller financing. She also brought claims for legal malpractice and breach of fiduciary duty, as to Zive only.[1]

Appellants contend that the trial court erred in denying their motions for nonsuit and judgment notwithstanding the verdict (JNOV) as to Brown's cause of action for failure to disclose seller financing, and that there was insufficient evidence to support the jury's verdict in favor of Brown and award of damages of $392,500 with respect to that claim. Appellants argue that the evidence compels the conclusion that seller financing was timely and properly disclosed, and that the damages award was unlawful and excessive. Brown cross-appeals the trial court's grant of nonsuit as to the fraud, negligent misrepresentation, legal malpractice, and breach of fiduciary duty causes of action, and the trial court's ruling that there was no basis for an award of punitive damages.

We hold that substantial evidence supports a damages award of only $325,283 on Brown's failure to disclose seller financing claim and reduce the award accordingly. We reverse the trial court's order of nonsuit in favor of appellants on the fraud cause of action, as well as its related ruling that there is no basis for the jury's consideration of an award of punitive damages as to the fraud cause of action. We remand for limited retrial on Brown's fraud claim. In all other respects, we affirm the judgment as modified.

## FACTS[2]

---

[1] Pacific Holdings, another partnership in which Zive was a partner, was also named as a defendant, but is not a party to this appeal.

[2] In accordance with the applicable standards of review, we recite the facts in a light most favorable to Brown.

On July 20, 2006, Brown entered into a purchase agreement with VACA for a furnished home. The price was $1,207,500, including $57,000 for furniture.

Brown had never prequalified for a loan, owned a house, or had any dealings in real estate transactions. She viewed the house for the first time on July 20, 2006. VACA held title to the house, and the transaction was conducted by Zive. Brown had not previously met Zive. Zive represented to Brown that he was a lawyer and a real estate expert. He said that he had been involved in the sale and purchase of numerous houses, and would represent them both and "do all of the transaction." Zive questioned Brown concerning her employment and salary, and proposed seller financing. Zive said his payments on his mortgage were approximately $2,700 to $2,800 per month, and that although the rate was variable the payments would not increase much over $200 to $300. Zive would obtain a wrap-around note so that Brown could take over his mortgage. Brown agreed, and said she could make the payments.

Zive handled the paperwork for the transaction. The purchase agreement provided for a $25,000 cash deposit, which was nonrefundable and payable directly to Zive. Brown paid the $25,000 the night she met Zive. Brown spent approximately 20 minutes with Zive prior to signing the purchase agreement. The transaction did not go through escrow, despite provisions for escrow in the purchase agreement. Brown's entire down payment was to be $155,000, also payable directly to Zive. Zive provided Brown with a copy of the purchase agreement and a buyer's inspection advisory. The purchase agreement stated that there would be seller financing.

On July 31, 2006, Zive took out a second mortgage on the house for $46,142.

On November 1, 2006, Zive provided Brown with a seller financing disclosure statement. The statement utilized a standard form that Zive had obtained from a lawyer he consulted. Zive filled out the form by hand. The disclosure statement showed that there were two mortgages on the house which would mature in 2036, with balances of $993,843 and $40,000, respectively. It stated that the rates were "variable," but did not provide the specific interest rates or disclose any terms related to the interest rates. No copies of the notes or further descriptions of their terms were attached. The disclosure

statement advised that the credit extended provided for deferred interest, and warned that if refinancing was required it might be difficult or impossible to obtain. It advised that the transaction involved the use of an all-inclusive (wrap-around) deed of trust providing that in the event of an acceleration of any senior encumbrance, Brown would be responsible for payment. It did not disclose the limit on the deferred interest allowed before a change in interest rates would occur on the first loan, or address the ramifications of negative amortization. Zive told Brown that the second mortgage would require that she pay $200 to $300 more per month. Brown signed the disclosure statement.

As of November 1, 2006, Brown had paid $125,000 toward the purchase price of the house, and made one payment of $3,030 on the underlying mortgage. She took possession of the house, but because she had not made the full down payment, transfer of title was delayed until the full down payment was made.

Title was transferred from VACA to Brown on January 3, 2007. Brown signed an all-inclusive purchase money promissory note dated December 30, 2006, in the amount of either $1,072,000 or $1,082,000, in favor of Zive.[3] The note had a maturity date of March 1, 2008. It stated that the total principal included a March 31, 2006 promissory note given by Zive with an original amount of $980,000, and a July 31, 2006 promissory note given by Zive with an original amount of $46,142. The note had an interest rate of 7.2 percent, which was "variable." Beginning November 1, 2006, loan payments of $3,030 per month "or more" were due at the start of each month. A late fee of 6 percent would be assessed for payments made after the 10th of the month. The note provided for a principal payment of $20,000, due December 31, 2006, with a late fee of $3,000 if payment was more than 10 days late. An interest rate of 18 percent would be assessed beginning January 10, 2007. The second page of the note provided that Brown would pay all principal and interest installments due on the note that were due under the terms

---

[3] The note references both amounts.

4

of the underlying mortgages. There was no additional information about the terms of the mortgages.

Per Zive's instructions, Brown made note payment checks payable to Washington Mutual, which held the underlying mortgages, and delivered the checks to Zive's office. Zive would then deliver the checks to Washington Mutual.

On January 4, 2007, Brown executed a second note secured by deed of trust in the amount of $11,283. A single payment of $11,283 was due by March 1, 2008. No interest would be charged if payment was timely. In the event of late payment the balance would bear interest at a rate of 16 percent. Brown timely paid the second note.

Brown received a letter sent from Washington Mutual to Zive dated March 22, 2007. The letter stated that the payment on the first mortgage had been adjusted to $2,906.86, based on an interest rate of 7.68 percent, there was a remaining term of 468 months, and projected principal balance of $1,015,681.13. The letter noted that the new payment was determined by the payment amount adjustment limitation provision in the promissory note. Without the limitation, the new payment would have been $6,848.38. The letter contained a list of prior interest rate adjustments. The new payment rate would take effect on May 1, 2007. A written note on the letter in Zive's handwriting requested that Brown make an additional $203 payment to add to the May payment, and also requested that checks in the amount of $2,906 be prepared for June through August. This was the first communication that Brown received from Zive which informed her of the interest rate on the first loan.

On March 2, 2008, Zive and Brown executed an addendum to the all-inclusive purchase money promissory note, which modified the note and extended the due date to March 1, 2010. The addendum provided for additional payments totaling $30,000 on a specified monthly schedule. The addendum stated that it would be void if Brown failed to make timely payments or otherwise breached any of the terms of the note and/or deed

of trust, and that Zive would then have the option to file a notice of default.[4]

In a letter dated August 18, 2008, Washington Mutual informed Zive that it would recast the first mortgage loan, increasing the payment to $5,380.89 as of February 2009, unless the total amount of interest due was paid monthly. The previous payments made on the loan were for less than the total amount of interest due. All unpaid interest had been added to the principal, and the principal was soon to reach its limit. Only payments of the full interest would prevent the recast.

In December 2008, Zive communicated to Brown that the first loan would be recast to $5,380.89, although there would be no change in the payment due on the second loan. Brown was distraught. Zive told her not to worry about the increase, but to continue to make her regular payments to him. He assured her that he would attempt to get a loan modification so that the payments would remain at around $3,000 per month. Brown continued to make the payments in the amount she had previously.

Washington Mutual stopped accepting Brown's checks on the underlying first mortgage after the recast took effect in February 2009, because the payments were less than the total monthly amount due. It continued to accept Brown's payment on the underlying second mortgage because payment was made in full. Zive deposited the payments on the first mortgage into an escrow account. Brown was unaware that the payments were not being accepted, and continued to make payments.

In September 2009, Zive asked Brown to meet him for dinner, and suggested that she short-sell the house. An outside investor would purchase it, and the house would come back to Zive. He would then try to get Brown back into possession of the house. Brown refused. Zive instructed her to keep making payments.

A few days later, there was a notice of an auction sale on Brown's door. She called Zive, who assured her that he would get the sale delayed. Brown was confused because she had not missed any payments. This was the first time she heard that her

---

[4] In her opening brief, Brown states that she executed the addendum, but the copy admitted into evidence bears only Zive's signature.

house was in foreclosure. Zive told Brown to contact a broker to whom he had paid $4,000 to work on a loan modification. When Brown contacted the broker, he wanted an additional $4,000.[5]

Brown stopped making payments on the promissory note and addendum in September 2009. Since 2006, she had made a total of $115,000 in monthly payments. She had also paid the full $155,000 down payment, paid $19,000 in payments per the 2008 addendum to the all inclusive purchase money promissory note, and made approximately $25,000 in property tax payments to Zive. She made unspecified extra payments on the second underlying mortgage, security alarm payments, insurance payments, and payments to a gardener for an unspecified period of time. Brown continued to live in the house after she ceased making payments under the note and addendum.

Brown received a foreclosure notice from Zive. The house was auctioned on September 12, 2011. Zive took the house as the beneficiary on the note. He transferred ownership to Phoenix Realty Investment, LLC (PRI), in which he held 98 percent ownership. PRI evicted Brown, and sued her for unlawful detainer, resulting in a judgment against her for $11,000.

## PROCEDURAL HISTORY

Brown brought suit against Zive, VACA, and Pacific Holdings, on June 25, 2010. Relevant here, at the time of trial, the operative second amended complaint alleged fraud, negligent misrepresentation, and failure to disclose seller financing as to VACA and Zive, and legal malpractice and breach of fiduciary duty as to Zive alone.

After Brown concluded her case-in-chief, appellants moved for nonsuit. Following oral argument by the parties, the trial court granted nonsuit in favor of

---

[5] It does not appear from the record that Brown paid the $4,000.

7

appellants on Brown's causes of action for fraud and negligent misrepresentation, and in favor of Zive on Brown's causes of action for legal malpractice and breach of fiduciary duty. It also ruled there was insufficient basis to support an award of punitive damages as to Brown's fraud claim. The court denied the motion with respect to Brown's cause of action for failure to disclose seller financing, finding that there was sufficient evidence for the issue to be presented to the jury.

Appellants were represented by counsel at trial. Brown appeared in pro per. On May 1, 2013, the failure to disclose seller financing cause of action, and another cause of action for conversion against Zive only, were submitted to the jury. Before the case was submitted to the jury, the trial court directed the parties to confer on jury instructions and special verdict forms. To the extent that there was disagreement, the trial court accepted the relevant jury instructions and special verdict form requested by appellants. The jury was instructed that Brown claimed general and special damages (CACI No. 3900), that monies paid by Brown and special damages were recoverable only once under the two remaining legal theories (CACI No. 3934), and that the economic damages Brown claimed included mortgage payments, down payment, deed payment, Zive's note, and storage (CACI No. 3903). The special verdict form did not provide for itemization of the damages award, and did not require the jury to find that respondent's failure to disclose seller financing, if any, was willful. The jury found in favor of Brown with respect to the failure to disclose seller financing cause of action, and awarded her a total of $392,500 in damages. It found in favor of Zive on the conversion cause of action.

On May 8, 2013, appellants moved for JNOV. The trial court denied the motion and entered judgment on June 13, 2013. Appellants made an ex parte application for clarification on the basis that the trial court did not include its reasoning in its minute order denying JNOV. The trial court took the matter under submission, and issued its order denying the ex parte application on June 28, 2013.

Appellants timely appealed, and Brown cross-appealed.

8

## DISCUSSION

### Standards of Review

A nonsuit is properly granted only when, disregarding conflicting evidence, giving plaintiff's evidence all the value to which it is legally entitled, and indulging in every legitimate inference that may be drawn from the evidence, there is insufficient evidence to support a verdict in the plaintiff's favor. (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838-839 (*Carson*).) The de novo standard of review applies to an order granting nonsuit. (*CC–California Plaza Associates v. Paller & Goldstein* (1996) 51 Cal.App.4th 1042, 1050-1051.)

"When considering a claim of insufficient evidence on appeal, we do not reweigh the evidence, but rather determine whether, after resolving all conflicts favorably to the prevailing party, and according the prevailing party the benefit of all reasonable inferences, there is substantial evidence to support the judgment." (*Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 465, disapproved on other grounds in *Guz v. Bechtal Nat. Inc.* (2000) 24 Cal.4th 317, 336.)

A judgment notwithstanding the verdict is proper only if there is no substantial evidence to support the verdict and the evidence compels a judgment in favor of the moving party as a matter of law. (Code Civ. Proc., § 629; *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 (*Sweatman*).) The trial court must view the evidence in the light most favorable to the verdict. (*Sweatman*, *supra*, at p. 68.) On appeal, we must independently determine whether substantial evidence supports the verdict and whether the moving party is entitled to judgment in its favor as a matter of law. (*Ibid.*)

### Failure to Disclose Seller Financing

Appellants contend that the trial court erred in denying their motion for nonsuit

9

with respect to Brown's cause of action for failure to disclose seller financing, the evidence is insufficient to support the jury's verdict, and the trial court erred in denying its motion for JNOV.  These claims lack merit.

Civil Code section 2956[6] provides as follows:  "In a transaction for the purchase of a dwelling for not more than four families in which there is an arranger of credit, which purchase includes an extension of credit by the vendor, a written disclosure with respect to that credit transaction shall be made . . . ."  Section 2963 outlines specific disclosures that must be made, including:

> "(b) A description of the terms of the promissory note or other credit documents or a copy of the note or other credit documents.
>
> "(c) Insofar as available, the principal terms and conditions of each recorded encumbrance which constitutes a lien upon the property which is or will be senior to the financing being arranged, including the original balance, the current balance, the periodic payment, any balloon payment, the interest rate (and any provisions with respect to variations in the interest rate), the maturity date, and whether or not there is any current default in payment on that encumbrance.
>
> "(d) A warning that, if refinancing would be required as a result of lack of full amortization under the terms of any existing or proposed loans, such refinancing might be difficult or impossible in the conventional mortgage marketplace.
>
> "(e) If negative amortization is possible as a result of any variable or adjustable rate financing being arranged, a clear disclosure of this fact and an explanation of its potential effect."

---

[6] All further statutory references are to the Civil Code, unless stated otherwise.

Such disclosure must be made "as soon as practicable, but before execution of any note or security documents." (§ 2959.)

Here, Brown testified that she received and signed a California Association of Realtors Seller Financing Disclosure Statement for the first time on November 1, 2006. The disclosure statement provided the amounts and maturity dates of the underlying loans, but disclosed only that the interest rates were "variable." It did not contain the specific interest rates or disclose any related provisions. The disclosure statement advised that the credit extended to Brown provided for deferred interest, and warned that if refinancing was required it might be difficult or impossible to obtain. It did not disclose the limit on the deferred interest allowed before a change in interest rates would be triggered on the first loan, or address the ramifications of negative amortization. Brown testified that prior to providing her with the disclosure statement, Zive assured her that her payments would not increase much over $200 to $300 per month, when in fact they increased by over $2,000 a month.

Given the numerous omissions from the disclosure statement and Zive's misstatement regarding the monthly payments, substantial evidence supports the conclusion that the disclosure was inadequate. Section 2963 requires that the loans be described or attached, that the interest rates be specified, that the buyer be informed of any provisions with respect to the interest rate, and be warned of the consequences of negative amortization. Brown produced substantial evidence that none of these disclosures were made prior to the execution of the note, and that the assurances she was given were inaccurate, at best.

Additionally, Brown signed the purchase agreement, and made a partial down payment of $25,000 on July 20, 2006. VACA's expert witness testified that the disclosure statement should have been given to her at that time or within a reasonable time afterwards. Zive was making payments on the first loan when the purchase agreement was executed, and was aware of the terms. He took the second loan out after the purchase agreement was executed, and was ostensibly aware of its terms as well. Despite this, Zive did not make *any* disclosures until several months later, on November

11

1, 2006.  By that date, Brown had paid $125,000 toward the purchase price of the house, made one payment of $3,030 on the underlying mortgage, and taken possession of the house.  Zive did not disclose further details of the loans until sometime after March 22, 2007, long after "execution of any note or security documents."  There is substantial evidence to support the conclusion that the disclosures were not made "as soon as practicable," as required under section 2959.

***Damages for Failure to Disclose Seller Financing***

Section 2965 provides that actual damages may be awarded when a party willfully fails to make required seller financing disclosures under section 2963.

Appellants contend that Brown should not have been awarded damages for failure to disclose seller financing because the jury never found that they willfully failed to disclose the statutorily required information.  Alternately, appellants argue that the award of $392,500 in damages was excessive.  We conclude that appellants forfeited the argument that damages in any amount are improper, but agree that damages must be reduced to those supported by substantial evidence.

With respect to the first argument, appellants requested all instructions pertaining to disclosure of seller financing and the special verdict on that cause of action.  If appellants wanted the jury to be instructed that a finding of willfulness was required to impose liability, they had ample opportunity to request such an instruction, but failed to do so.  Appellants instead drafted and submitted instructions and a special verdict that omitted any mention of willfulness and submitted them to the trial court.  Appellants cannot now complain about the instructions or special verdict form that they requested. (*Transport Ins. Co. v. TIG Ins. Co*. (2012) 202 Cal.App.4th 984, 1000; *Stevens v. Owens-Corning Fiberglas Co.* (1996) 49 Cal.App.4th 1645, 1653.)

As to the question of the amount of damages, the testimony of a single witness, including the party, is ordinarily sufficient.  (*Jensen v. BMW of N. America, Inc.* (1995) 35 Cal.App.4th 112, 134.)  As appellants concede, Brown testified that she made

12

$115,000 in payments to Zive on the note, a $155,000 down payment, an $11,283 additional payment to Zive, and $25,000 in property taxes to Zive, for a total of $306,283. Brown further testified that she made $19,000 in payments per the 2008 addendum to the all inclusive purchase money promissory note in addition to her mortgage payment. She therefore provided substantial evidence of damages in the amount of $325,283.

There is no basis for reducing the amount of damages based on the rent Brown "should have paid" while living in the house or elsewhere, as appellants urge. The burden of proving facts in mitigation of damages rests upon the defendant. (*Jackson v. Yarbray* (2009) 179 Cal.App.4th 75, 97; *Carnation Co. v. Olivet Egg Ranch* (1986) 189 Cal.App.3d 809, 817-818, and cases cited therein.) In this case, appellants offered no evidence by which the jury could estimate what Brown's rental costs would have been, and did not meet their burden.

Nor is there any basis for concluding that there was substantial evidence of other expenses, as Brown argues. It does not appear from the record that Brown made more than $25,000 in tax payments. Additionally, Brown offered no evidence that would allow the jury to estimate the costs for which she gave no exact amounts or payment duration, including extra payments on the second underlying mortgage, security alarm payments, insurance payments, and payments to a gardener.

Finally, a plaintiff must prove a causal connection between the damages she seeks and the defendant's wrongful conduct, and demonstrate that the detriment she suffered was a natural and probable consequence of the defendant's conduct. (*Chaparkas v. Webb* (1960) 178 Cal.App.2d 257, 260.) In this case, the unlawful detainer judgment was not a natural and probable consequence of the failure to disclose seller financing, it was the natural and probable consequence of Brown's choice to remain in the house for two years after it had been foreclosed.

*Fraud and Negligent Misrepresentation*

Brown contends that the trial court erred in granting appellants' motion for nonsuit with respect to her claims for fraud and negligent misrepresentation. We agree.

Generally, "'"[t]he elements of fraud, which give[ ] rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'" [Citation.]" (*Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173 (*Small*).) Additionally, to establish fraud through nondisclosure or concealment of facts, it is necessary to show the defendant "was under a legal duty to disclose them." (*Lingsch v. Savage* (1963) 213 Cal.App.2d 729, 735.)

Claims for negligent misrepresentation deviate from this set of elements. "The tort of negligent misrepresentation does not require scienter or intent to defraud. [Citation.] It encompasses '[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true' [citation], and '[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true' [citations]." (*Small*, *supra*, 30 Cal.4th at pp. 173-174.)

Here, the first and last elements of fraud and negligent misrepresentation have been established. There is more than sufficient evidence to support the conclusion that appellants failed to disclose seller financing, which they were legally required to do, and that Brown was damaged as a result.

There was also sufficient evidence to support a finding of scienter. Zive was paying on the first mortgage at the time the parties entered into the purchase agreement, and took out the second mortgage soon thereafter. He had access to the loan statements, and thus was either aware (fraud) or should have been aware (negligent misrepresentation) that his statements about the first mortgage payment were untrue and that the information he provided was woefully incomplete.

The requirement of intent to defraud or induce reliance to establish liability for fraud was also supported by sufficient evidence to support a verdict in Brown's favor. Brown produced evidence that Zive knew she was making payments that would not cover the interest on the first mortgage, and that the principal limit would be reached, causing the loan to be recast. Despite this, he urged her to keep making her regular payments, and assured her that making payment would keep the house in her possession.

Finally, Brown presented evidence that she justifiably relied on Zive's misrepresentations. To establish reliance was justifiable, a plaintiff must show the "'circumstances were such to make it *reasonable* for [her] to accept [the] defendant's statements without an independent inquiry or investigation.' [Citation.] The reasonableness of the plaintiff's reliance is judged by reference to the plaintiff's knowledge and experience. [Citation.]" (*OCM Principal Opportunities Fund v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 864 (*OCM*).) "Generally, '[a] plaintiff will be denied recovery only if his conduct is manifestly unreasonable in the light of his own intelligence or information. It must appear that he put faith in representations that were "preposterous" or "shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth." [Citation.] Even in case of a mere negligent misrepresentation, a plaintiff is not barred unless his conduct, in the light of his own information and intelligence, is preposterous and irrational. [Citation.]' [Citation.]" (*Id.* at p. 865; see *Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1067 (*Beckwith*).) Reasonable reliance is an inherently factual inquiry rarely amenable to resolution as a matter of law. As the California Supreme Court explained in *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239: "'Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact.' [Citations.]"

Brown testified to her complete lack of experience in real estate transactions, and in her trust in Zive. "[T]he law is clear that ""[n]o rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool.""" [Citation.] . . . .

""'Nor is a plaintiff held to the standard of precaution or of minimum knowledge of a hypothetical, reasonable man.' [Citation.]""" (*Beckwith*, *supra*, 205 Cal.App.4th at p. 1067; see also *Boeken v. Philip Morris, Inc*. (2005) 127 Cal.App.4th 1640, 1666-1667; *Hartong v. Partake, Inc*. (1968) 266 Cal.App.2d 942, 964-965 (*Hartong*).) In light of Brown's circumstances and inexperience, it would not be irrational for her to rely on the disclosure statement. Brown testified that Zive told her he was a lawyer and real estate expert. It would not be unreasonable for Brown to expect Zive to know what disclosures were necessary and to timely make all required disclosures. There is substantial evidence that the disclosure statement was incomplete in material respects, and a jury could reasonably find that, considering Brown's naiveté, her failure to investigate would not be "preposterous." (*OCM*, *supra*, 157 Cal.App.4th at p. 865.) Nothing on the face of the disclosure statement was "so patently and obviously false" that she must have "'closed [her] eyes to avoid discovery of the truth.'" (*Ibid*.) Moreover, Zive's false statements regarding the possible fluctuation in interest rates on the first mortgage were plausible, particularly in light of the other material information and warnings that were omitted from the disclosure statement. (*Hartong, supra,* at pp. 965-966 ["If the defendant makes a plausible explanation of fact, the plaintiff is not required to further investigate"].) Taking into account the highly factual nature of the inquiry, there is sufficient evidence to support a finding that Brown's reliance was justifiable.

Because Brown provided sufficient evidence of all the elements of fraud and negligent misrepresentation to support a verdict in her favor, the trial court erred in granting nonsuit as to both causes of action. The error was harmless with respect to Brown's negligent misrepresentation cause of action, however, because the jury awarded the maximum amount of actual damages supported by substantial evidence. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475 ["No judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial . . . and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed"].) A plaintiff may only recover actual damages for negligent

16

misrepresentation. (*Fragale v. Faulkner* (2003) 110 Cal.App.4th 229, 236-237.) Brown cannot be prejudiced, because no other damages are available to her.

With respect to Brown's fraud cause of action, section 3294, subdivision (a) allows the recovery of punitive damages "[i]n an action for the breach of an obligation not arising from contract, where it is proven . . . the defendant has been guilty of oppression, fraud, or malice . . . ." As appellants concede, Brown's complaint requested punitive damages with respect to her fraud claim. We cannot conclude that the grant of nonsuit as to her fraud claim was harmless. Brown is entitled to present her fraud claim to the jury, and to recover punitive damages, if warranted by the evidence.


### *Legal Malpractice and Breach of Fiduciary Duty*


Brown contends that the trial court erred in granting appellants' motion for nonsuit with respect to her legal malpractice and breach of fiduciary duty claims. Appellants argue that the claims fail as a matter of law, and that Brown failed to properly state a cause of action for punitive damages with respect to either claim.

Appellants are correct that Brown did not state a cause of action for punitive damages as to the legal malpractice claim in the operative complaint. Moreover, she failed to argue that punitive damages should adhere to the legal malpractice claim in her opening brief, thus waiving the issue on appeal. (*People v. Baniqued* (2000) 85 Cal.App.4th 13, 29.) As we discussed above, Brown was awarded the maximum amount of actual damages supported by substantial evidence, which are the only damages available to her relating to her legal malpractice cause of action. As a consequence of Brown's failure to state a cause of action for punitive damages, any error that the trial court might have made in granting nonsuit on the legal malpractice claim would be harmless, because it would not affect Brown's recovery. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.)

However, Brown's contention that the trial court erred in granting nonsuit on her breach of fiduciary duty cause of action cannot be resolved on this basis. Brown's

17

complaint stated a cause of action for punitive damages with respect to her claim for breach of fiduciary duty, and section 3294, subdivision (a) allows for the recovery of punitive damages as to that cause of action, if appropriate. (*Scott v. Phoenix Schools, Inc.* (2009) 175 Cal.App.4th 702, 715.)

As stated above, in resolving the issue of whether nonsuit was properly granted, we "must give . . . plaintiff'[s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference that may be drawn from the evidence . . . ." (*Carson*, *supra*, 36 Cal.3d at pp. 838-839.) "'The rules governing the granting of a nonsuit, however, do not relieve the plaintiff of the burden of establishing the elements of his case. The plaintiff must therefore produce evidence which supports a logical inference in his favor and which does more than merely permit speculation or conjecture. [Citation.] If a plaintiff produces no substantial evidence of liability or proximate cause then the granting of a nonsuit is proper. [Citation.]' (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402.)" (*Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1209.)

"'The elements of a cause of action for breach of fiduciary duty are the existence of a fiduciary relationship, its breach, and damage proximately caused by that breach. [Citation.]' [Citation.]" (*Knox v. Dean* (2012) 205 Cal.App.4th 417, 432.) A fiduciary duty may arise as a consequence of either a fiduciary relationship or a confidential relationship. "'"[A] fiduciary relationship is a recognized legal relationship such as guardian and ward, trustee and beneficiary, principal and agent, or attorney and client . . . whereas a 'confidential relationship' may be founded on a moral, social, domestic, or merely personal relationship as well as on a legal relationship."' [Citations.]" (*Persson v. Smart Inventions, Inc.* (2005) 125 Cal.App.4th 1141, 1160.) "'The essence of a fiduciary or confidential relationship is that the parties do not deal on equal terms because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party.' [Citation.]" (*Richelle L. v. Roman Catholic Archbishop* (2003) 106 Cal.App.4th 257, 271 (*Richelle L.*).)

18

Brown contends that she presented evidence of both a fiduciary relationship and a confidential relationship between herself and Zive sufficient to withstand a motion for nonsuit. We disagree.

Brown first asserts that she and Zive had a fiduciary relationship as attorney and client. "'"Except for those situations where an attorney is appointed by the court, the attorney-client relationship is created by some form of contract, express or implied, formal or informal. [Citation.]" [Citations.] . . . [¶] "An implied contract is one, the existence and terms of which are manifested by conduct." [Citation.] "The distinction between express and implied in fact contracts relates only to the manifestation of assent; both types are based upon the expressed or apparent intention of the parties." [Citation.] [¶] . . . [¶] . . . [I]n determining whether an attorney-client relationship exists . . . primary attention should be given to whether the totality of the circumstances, including the parties' conduct, implies an agreement by the . . . attorney not to accept other representations adverse to the [putative client's] personal interests. (See Friedman, *The Creation of the Attorney-Client Relationship: An Emerging View* [(1986)] 22 Cal. W[estern] L.Rev. [209,] 231 suggesting that one of the most important facts involved in finding an attorney-client relationship is "the expectation of the client based on how the situation appears to a reasonable person in the client's position.") [¶] . . . [¶] The question of whether an attorney-client relationship exists is one of law. [Citation.] However, when the evidence is conflicting, the factual basis for the determination must be determined before the legal question is addressed. [Citation.]' [Citation.]" (*Strasbourger Pearson Tulcin Wolff Inc. v. Wiz Technology, Inc.* (1999) 69 Cal.App.4th 1399, 1404 (*Strasbourger*).) Because we review the grant of a motion for nonsuit, we do not consider conflicting evidence, but rather resolve all conflicts in favor of Brown.

Here, the evidence of an attorney/client relationship consisted of Brown's testimony that Zive told her he was an attorney and that he would represent them both

and handle the transaction.[7]  Even assuming the truth of Brown's testimony, and drawing all inferences in her favor, the totality of the circumstances do not imply an agreement in which Zive would not "accept other representations adverse to [Brown's] personal interests," nor would a reasonable person believe that to be the case.  (*Strasbourger, supra*, 69 Cal.App.4th at p. 1404.)  It is undisputed that Brown met Zive approximately 20 minutes before she signed the purchase agreement.  They met at the residence—not a law office—for the sole purpose of transacting for the purchase of a house.  As buyer and seller, their postures were clearly adverse.  Zive would unquestionably benefit from selling the property to Brown and arranging financing, and could be expected to do so on terms favorable to himself.  Moreover, the buyer's inspection advisory provided to Brown by Zive that evening warned repeatedly that the interests of buyer and seller were adverse.  Finally, although neither a written contract nor compensation is required to establish an attorney/client relationship, the absence of both militate against the conclusion that Zive intended to act in Brown's best interests rather than in his own.  Absent payment and written obligation, he had no obvious motivation to act as an attorney representing Brown's best interests.  The trial court did not err in determining that there was no attorney/client relationship as a matter of law.

"'A "confidential relationship," as that term is used in the cases, refers to an unequal relationship between parties in which one surrenders to the other some degree of control because of the trust and confidence which he reposes in the other.  When a confidential relationship is found to exist, the one in whom confidence was reposed may be held to a higher standard of disclosure and fairness than in an arm's-length relationship . . . .'"  (*Richelle L., supra,* 106 Cal.App.4th at p. 272, fn. 6.)  The essential elements of a confidential relationship are as follows:  "'1) The vulnerability of one party to the other which 2) results in the empowerment of the stronger party by the weaker which 3) empowerment has been solicited or accepted by the stronger party and 4)

---

[7] Zive testified that he was an Israeli attorney, and had registered with the California Bar as a foreign legal consultant.  He was not barred in California.

20

prevents the weaker party from effectively protecting itself.' [Citation.]" (*Id*. at p. 272.) "The vulnerability that is the necessary predicate of a confidential relation, and which the law treats as 'absolutely essential' (Bogert, *Trusts & Trustees* (2d ed. 1978) § 482, at pp. 288-289), usually arises from advanced age, youth, lack of education, weakness of mind, grief, sickness, or some other incapacity." (*Id*. at p. 273.)

In her opening brief on cross appeal, Brown alleges that, "[b]y telling Brown he was an attorney and an expert in real estate finance, Zive fostered the impression that he was much more knowledgeable than Brown." The crux of her argument appears to be that because Zive told her he had more education and experience than she did in the areas of law and real estate, she was necessarily vulnerable. But a mere difference in degree of experience or education does not create a fiduciary duty. Such differences abound. If having less experience or education constituted incapacity, virtually every purchase and sale transaction would give rise to a fiduciary duty, because people vary in their experience and education and "[e]very contract requires one party to repose an element of trust and confidence in the other to perform." (*Wolf v. Superior Court* (2003) 107 Cal.App.4th 25, 31.) Absent a showing of vulnerability, which is an essential element of her cause of action, Brown cannot demonstrate that she and Zive had a confidential relationship. The evidence is necessarily insufficient to support a verdict in Brown's favor as to her breach of fiduciary duty cause of action. The trial court did not err in granting the motion for nonsuit as to the claim.

## DISPOSITION

The judgment is modified to reduce the damages awarded to $325,283. The order granting nonsuit as to the fraud cause of action and the related claim for punitive damages is reversed. The cause is remand for limited retrial on Brown's cause of action for fraud, and if appropriate, punitive damages. In all other respects the judgment is affirmed. Brown is awarded costs on appeal.

KRIEGLER, J.

We concur:

TURNER, P. J.

GOODMAN, J. *

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.