Filed 4/24/23  Park v. Kim CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| HYUN JOU PARK, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> HESOOK KIM et al., <br><br> Defendants and Respondents. | B310225 <br><br> (Los Angeles County Super. Ct. No. 20STCV31674) |

APPEAL from an order of the Superior Court of Los Angeles County, Christopher K. Lui, Judge.  Affirmed.

Klapach & Klapach and Joseph S. Klapach for Plaintiff and Appellant.

TroyGould, Aaron Bloom, and Amy Nashon for Defendants and Respondents.

_____

Plaintiff and appellant Hyun Jou Park appeals from an order disqualifying her attorney and his law firm from representing her in this action against her mother and brother arising out of a real estate transaction. The trial court based the disqualification order on its finding the attorney had jointly represented Park, her mother, and her brother in the same real estate transaction that is the subject of this action. The court concluded disqualification of the attorney in this successive representation of Park against her family members is mandatory, based on the legal presumption that the attorney received confidential information from Park's family members in the prior joint representation. On appeal, Park contends disqualification is not required because her attorney never had an attorney-client relationship with her mother or brother and, even if he did, they had no reasonable expectation that their communications with the attorney would be kept confidential from her during the prior joint representation. We conclude the trial court's factual findings are supported by substantial evidence, and the trial court did not abuse its discretion in ordering the disqualification of the attorney and his firm. Accordingly, we affirm the order.

## BACKGROUND

I.  **The Pleadings**

A.  **Original complaint**

In August 2020, Park and her attorney, Jeff Katofsky, as coplaintiffs,[1] filed this action against Hesook Kim, Park's mother,

---

[1] As explained below, Katofsky does not assert a cause of action or request relief in the operative first amended complaint.

and Hyun Kwon Kim, Park's brother (collectively, the Kims),[2] in their individual capacities and as trustees of the Hesook Kim Trust Executed 8/24/04 (the Trust). Katofsky and two other attorneys from his firm represented Park and Katofsky on the original complaint. The complaint alleged as follows, in pertinent part:

The Kims are cotrustees of the Trust.[3] In or around March 2020, the Trust sold an asset (a piece of real estate) for nearly $10 million. The net proceeds of the sale, $7.7 million, were to be divided into five equal shares of $1,542,066 and distributed to each beneficiary of the Trust, after being reinvested in transactions that qualified for deferred capital gains under Internal Revenue Code section 1031.

In or around May 2020, using four of the beneficiaries' shares of the $7.7 million in proceeds, excluding Park's share, the Trust purchased a property in Burbank for $6 million. For Park's share of the proceeds, the Kims asked Park to find a property that would satisfy the legal requirements of an Internal Revenue Code section 1031 exchange. Park and the Kims decided to

---

[2] Because defendants Hesook Kim and Hyun Kwon Kim share the same surname, when referring to them individually, we will use the names Hesook and Hyun Kwon to avoid confusion and not as a sign of disrespect.

[3] As stated in Hyun Kwon's declaration in support of the motion to disqualify, during Hesook's lifetime, the Trust's income and principal shall be used to pay her expenses and maintain her standard of living. Hesook's four adult children, including Hyun Kwon and Park are the Trust's primary remainder beneficiaries.

3

jointly purchase a property, referred to in this action as the Moorpark Property, for $3.5 million.

As reflected in a May 29, 2020 purchase and sale agreement (the PSA) attached to the complaint, an entity called Double Play, LLC (Double Play) owned the Moorpark Property. Katofsky was Double Play's Managing Member, and he drafted the PSA. Park, Hesook, and Hyun Kwon signed the PSA as buyers and tenants in common; Katofsky signed on behalf of the seller, Double Play. Park and the Kims were to assign their rights under the PSA to the Trust.

The complaint alleged: "To protect the 1031 exchange and prepare for the closing of the Moorpark transaction, significant legal work was required. Defendants [the Kims] specifically requested [plaintiff Katofsky] to perform such work and agreed to pay for such." In support of these allegations, Park and Katofsky referenced and attached to the complaint an email exchange between Hyun Kwon and Katofsky, which we summarize here.

In an email dated June 29, 2020, a month after the parties signed the PSA, Hyun Kwon thanked Katofsky "for taking [his] call and explaining 1031 exchange laws to [him]." Hyun Kwon provided his "thoughts" regarding proposed terms of an agreement to "transfer 100 percent" of the Moorpark Property from the Trust to Park around a year after the close of escrow of the Moorpark Property transaction. He asked Katofsky whether both he and Hesook would sign such an agreement, or only Hesook. He concluded the email, stating: "Let me know if this will work for the agreement. I value your expertise a lot on this matter therefore, I am always open for better ways. [¶] You should also ask Helen Park for her input on this matter. [¶] Thank you again for your help."

4

On July 14, 2020, Hyun Kwon sent a follow-up email to Katofsky, stating: "You were going to write in legal terms an agreement letter (content is in yellow highlight [in the attached June 29, 2020 email referenced above]) for both Helen Park and [the] Trust. [¶] When can we have a draft/brief ready? We will pay for the fee if that is the issue. [¶] Thank you in advance."

Park and Katofsky alleged in the complaint that in or around late July 2020, the Moorpark Property transaction was ready to close. By that point, Park had "incurred over $260,000 in fees, inspections, costs and commissions on the transaction." The Kims and the Trust had signed all documents required to complete the purchase. According to the complaint, some of the documents "were rejected by title for a fraudulent notary acknowledgement. [¶] . . . After being notified of the fraudulent notary acknowledgement, Defendants [the Kims], on the day of closing, cancelled the transaction, refused any further document signing and refused to close the transaction or pay Plaintiff Park. [The] Trust will now suffer severe tax liability and has indicated it will not pay Park or Katofsky as promised."

In the first cause of action in the original complaint, Katofsky alleged: "Plaintiff Katofsky and Defendants [the Kims] had an oral agreement whereby Defendants requested and received legal services." Katofsky further alleged the Kims and the Trust "breached the agreement by failing to pay for such services" in an amount not less than $32,800.

Seeking, among other relief, a $1,542,066 share of the net proceeds from the Trust's sale of real property, and reimbursement of expenses incurred in the Moorpark Property transaction, Park asserted causes of action against the Kims and the Trust for breach of oral contract, intentional and negligent

5

interference with contract, promissory estoppel, and common law fraud.

**B.** **The Kims' petition for arbitration of Katofsky's attorney fees claim**

The Kims retained counsel to represent them in this action in their individual capacities and as trustees of the Trust. On September 15, 2020, their counsel sent a letter to Katofsky, informing him that the Kims intended to file (1) a request for arbitration of a fee dispute under the Mandatory Fee Arbitration Act (Bus. & Prof. Code, § 6200 et seq.), (2) a notice of automatic stay of the action due to the filing and service of the request for arbitration (Bus. & Prof. Code, § 6201), and (3) a "motion to disqualify [Katofsky] from representing Park in this action since Park's purported claims against the Kims relate to the exact same Transaction in which [Katofsky] represented the Kims."

The Kims' counsel asserted in the letter to Katofsky: "In the Complaint, you admit that the Kims hired you to perform legal work for them in connection with the Moorpark [Property] Transaction. Your legal representation of the Kims creates a number of problems with respect to the Complaint you have filed on behalf of yourself and Park against your clients, the Kims." (Fn. omitted.) One of the "problems" the Kims' counsel enumerated is that Katofsky "never terminated the attorney-client relationship between [him] and the Kims prior to filing the lawsuit against them."

The following day, September 16, 2020, Katofsky sent a letter to the Kims' counsel, stating in full: "Thank you for your September 15, 2020 letter regarding this matter. [¶] I represented, and still represent, the Park Family, never the Kims. [¶] Have a nice day."

6

On or about September 17, 2020, the Kims filed a petition for arbitration of Katofsky's attorney fees claim with the Los Angeles County Bar Association. Therein, they alleged: Katofsky "violated multiple conflict of interest rules. He advised clients with respect to a real estate transaction and is now suing them on behalf of himself and the adverse party in that exact same transaction. [Katofsky] also had a personal interest in the transaction and did not obtain informed written consent from clients."

On September 23, 2020, the Kims filed a notice of stay of this action while the fee arbitration was pending.

### C. First amended complaint

On October 9, 2020, Katofsky filed a request for dismissal of his cause of action against the Kims for breach of oral contract for legal services, thereby obviating the need for a fee arbitration and avoiding an automatic stay of this action. The same day, he filed a first amended complaint on behalf of Park in which she asserted the same five causes of action against the Kims that she had alleged in the original complaint. She increased her claim for damages by $32,800, the amount Katofsky had sought in the original complaint, and she alleged in the first amended complaint: "To protect the 1031 exchange and prepare for the closing of the Moorpark [Property] transaction, significant legal work was required. [Katofsky] performed such work and Plaintiff [Park] paid for such, at a cost of $32,800."

## II. The Kims' Motion to Disqualify Katofsky

### A. Moving papers

On November 13, 2020, the Kims filed a motion to disqualify Katofsky and his law firm, Katofsky Law, from representing Park in this action. The motion was supported by a

7

declaration from Hyun Kwon.  Therein, he stated that after the Trust sold the piece of real estate in March 2020 (as referenced above), the Trust engaged Katofsky and Katofsky Law (collectively, Katofsky) "to assist it in structuring the transaction so that it would qualify as a tax-deferred exchange" under Internal Revenue Code section 1031.  At the same time, Katofsky was also advising Park in connection with the 1031 exchange and her purchase of a piece of property jointly with the Trust.  According to Kwon, "Katofsky accepted the representation but did not prepare a written representation agreement, did not advise [them] of any potential or actual conflicts of interest involved in representing the interests of multiple family members . . ., and did not obtain [their] informed written consent regarding the joint representation."

Hyun Kwon further stated in the declaration that Katofsky advised the Kims, as trustees of the Trust, with respect to the purchase of the property in Burbank as well as the purchase of the Moorpark Property.  With respect to the latter transaction, Hyun Kwon stated that at the time he and Hesook signed the May 29, 2020 PSA, they were unaware of Katofsky's role in Double Play, the seller of the Moorpark Property (although Katofsky signed the PSA as Double Play's Managing Member).  Katofsky "did not obtain informed written consent from [the Kims] in connection with [his] role as seller in the transaction" or advise them to "to seek independent counsel."

Hyun Kwon attached to his declaration another purchase and sale agreement that Katofsky prepared and had the Kims sign in or around June or July 2020, which was postdated June 15, 2021.  Under this agreement, the Trust would sell the Moorpark Property to an entity called MoreMoorPark, LLC for

8

$2,010,000, nearly $1.5 million less than they were going to pay under the May 29, 2020 PSA to purchase the Moorpark Property from Double Play.

According to Hyun Kwon's declaration, the Kims canceled the Moorpark Property transaction, forfeiting a $175,000 deposit they had made, after they became aware of Katofsky's role as seller and "became concerned that going forward with the [transaction] would amount to tax fraud (since immediately / simultaneously selling the Moorpark Property would negate the requisite intent to hold the property for investment at the time of the exchange."

Hyun Kwon asserted that during Katofsky's representation of the Kims, Katofsky "knowingly obtained confidential information from [the Kims] about [their] real estate transactions, tax planning, and trust administration and used that information to advise [them] and prepare documents on [their] behalves [*sic*]."

In their motion, the Kims argued Katofsky should be disqualified from representing Park in this action because (1) Katofsky still represented the Kims when he filed this action against them; (2) even if the Kims were former clients when Katofsky filed this action, the action is substantially related to Katofsky's representation of the Kims, and he owes the Kims ongoing duties of loyalty and confidentiality; (3) Katofsky "did not obtain the Kims' informed written consent to the conflicts of interest presented by the representation"; and (4) Katofsky is "seeking to enforce a financial transaction in which he has a major financial interest."

### B. Park's substitution of counsel and opposition to the disqualification motion

On November 30, 2020, Park substituted Gary Salomons and Salomons Law Group as her counsel in this action. On December 4, 2020, Salomons filed on Park's behalf an opposition to the Kims' disqualification motion, in which Park argued the Kims' motion was moot based on her substitution of counsel. Park acknowledged that Salomons was listed on Katofsky's letterhead as "of counsel," but argued this designation "is, for all practical purposes meaningless," because although Salomons rented office space from Katofsky, he operated his own law practice and had his own malpractice insurance policy, which listed him as a solo practitioner. In an accompanying declaration, Salomons stated he had "not spoken to Katofsky about any information that was provided by [the Kims] in the course of Katofsky's apparent alleged facilitation of the 1031 exchanges."

Katofsky also submitted a declaration in support of Park's opposition to the disqualification motion. Therein, he stated: "I specifically advised [the Kims] that I represented the Park family for close to 20 years. I specifically advised [the Kims] that I did not represent them. [The Kims] specifically advised me that they had separate legal counsel and accountants but did not want me to directly communicate with either to keep their costs down." Katofsky had a retainer agreement with the Park family but "did not send or prepare a retainer agreement to [the Kims] because they had their own legal counsel."

Regarding his role in the Moorpark Property transaction, Katofsky stated: "In May 2020, in order to protect tax-deferment provided by Internal Revenue Code section 1031 and prepare for

the closing on the Moorpark Property, [the Kims] requested that I, as seller's counsel, prepare a first draft of [the PSA] and other closing documents. Those documents would then be vetted by [the Kims'] legal counsel and accountants. I prepared the documents as requested." He added: "It is standard in every real estate transaction that one side's lawyer prepares the first draft. It is also standard that either the parties split the cost or, as here, the buyer pays all legal costs of document preparation."[4]

Katofsky denied receiving any confidential information from the Kims. He asserted: "To the extent some information was provided to me, it was, and continues to be, information that was not material to [Park]'s claims asserted against [the Kims], which are based upon [the Kims'] failure to pay [Park] the sum of $1,542,066." Katofsky also denied discussing with Salomons any communications he had with the Kims.

In her opposition, Park argued disqualification is not required because (1) the Kims failed to meet their burden of establishing Katofsky represented them; (2) even if Katofsky represented them, the representation concluded, and "there is no 'substantial relationship' between Katofsky's assistance in preparing the first draft of closing documents for the Moorpark property . . . and Katofsky's previous representation of [Park] in this action"; and (3) the Kims failed to meet their burden of establishing Katofsky obtained material confidential information.

---

[4] We note that the May 29, 2020 PSA that the parties signed provides that each side would pay its own attorney fees in connection with the Moorpark Property transaction and does not state that the Kims would be solely responsible for the costs of document preparation.

11

Based on these arguments, Park asserted "Salomons is not subject to vicarious disqualification."

### C.    The Kims' reply brief

In their reply brief in support of their motion, filed on December 10, 2020, the Kims argued disqualification is required because (1) Katofsky "expressly admitted" in the original complaint that he represented the Kims, and the email exchange between Hyun Kwon and Katofsky (summarized above) demonstrates such representation; and (2) the prior and current representations are substantially related, so the exchange of confidential information is conclusively presumed. The Kims also argued that disqualification "extends" to Salomons, as he is listed as a "member" of Katofsky Law on the firm's Web site and "of counsel" on the firm's letterhead; and *after* Salomons substituted in as counsel for Park, an associate from Katofsky Law appeared on behalf of Park at a hearing in this matter. There was no showing of separation between Katofsky and Salomons or ethical wall rules and procedures.

Hyun Kwon submitted a supplemental declaration in support of the Kims' reply brief. He stated Katofsky was the "only lawyer who gave legal advice to [the Kims] regarding the 1031 exchange and the Moorpark [Property] transaction." The Kims did not have independent counsel and he never told Katofsky they did. Nor did Katofsky tell the Kims that he only represented Park in connection with the 1031 exchange and the Moorpark Property transaction. Hyun Kwon stated he had "extensive discussions" with Katofsky regarding the Kims' "real estate transactions, tax planning, and trust administration, including the potential distribution of Trust assets, which is now at issue in this action."

12

### D. Further briefing by the parties
#### 1. Park's supplemental briefing

On December 30, 2020, with the permission of the trial court, Park filed a sur-reply, accompanied by declarations. Park submitted a declaration stating Katofsky was her lawyer, and she told Hyun Kwon that Katofsky was "providing [her] counsel regarding the Moorpark [Property] transaction." Hyun Kwon never indicated to her that he believed Katofsky was representing him, Hesook, or the Trust. Hyun Kwon "repeatedly told [her] that he had his own lawyer and would be discussing the Moorpark [Property] transaction with him, including the first draft of [the PSA] prepared by [her] lawyer, Mr. Katofsky." Hyun Kwon declined her offer to have Katofsky communicate directly with his lawyer, stating he wanted "to keep attorney costs down." He told her he would discuss the transaction with his own lawyer and relay information to Katofsky. She told him "to stop contacting Mr. Katofsky because [she] was incurring legal fees for Mr. Katofsky helping [her] with the 1031 exchange process. In response, [Hyun] Kwon explicitly told [her] that he would pay Mr. Katofsky's legal bill."

In support of her assertion that Katofsky was only her lawyer, and not the Kims' lawyer as well, Park attached to her declaration text message exchanges with Hyun Kwon. In an April 17, 2020 exchange, Hyun Kwon sought information about the status of the Moorpark Property transaction, and Park responded, in pertinent part: "I will forward the information to you as soon as we have finished negotiating the purchase/sale

13

agreement as it is being reviewed by counsel."[5]  In a June 2020 exchange, Hyun Kwon wrote, "Ask you [*sic*] smart lawyer who owns the property."  Park responded:  This is our lawyer Jeff Katofsky, Esq." and provided his phone number.  Hyun Kwon replied: "I just discussed with Jeff.  I explained the issue and he will explain what we need to do.  Call him."  Park argued in her sur-reply that this text exchange shows the Kims did not engage Katofsky in connection with the Burbank and Moorpark property transactions because in June 2020, Hyun Kwon was referring to Katofsky as Park's lawyer.

Katofsky submitted a supplemental declaration, stating he never spoke with Hesook, and he only spoke to Hyun Kwon after the Burbank transaction closed.  Initially, the Park family asked him to prepare a first draft of the PSA for the Moorpark Property transaction and later, after the transaction was changed by the Parks and the Kims, he "was then asked to redraft those documents, including a loan package, leases and subsequent purchase and sale documents."[6]  At most, he spoke with Hyun

---

[5] Park stated in her declaration that she "did not even involve Mr. Katofsky until after the Burbank transaction closed escrow."  In her complaint and first amended complaint, she alleged the Trust purchased the Burbank property in May 2020.  But here, in these text messages, she references an agreement related to the Moorpark Property transaction that "is being reviewed by counsel" the previous month, in April 2020.  It appears, therefore, that Katofsky was "involved" before the Burbank transaction closed escrow.

[6] Prior to the filing of this supplemental declaration, Katofsky had maintained that it was the Kims who requested he

Kwon three times "about some 1031 issues that would need to be covered in the documents" for the Moorpark Property transaction. No confidential information was exchanged during these discussions. When he and Hyun Kwon emailed, "there were one to three other people included" on the correspondence. He "did not interpret the Kims' agreement to pay [his] legal fees for drafting the documents as creating an attorney-client relationship because Borrowers[7] always pay those fees and costs." He repeated other statements he made in his initial declaration, which we summarized above.

Park also submitted a declaration from Stacey Rosenberg, a partner in the Finance and Bankruptcy Practice Group at Sheppard Mullin Richter & Hampton LLP. She stated that "[a]s an industry standard, the Borrower pays for the legal fees and costs of both the Lender's and its own counsel," but the "Lender's counsel never represents the Borrower in the same transaction." Fees for preparing documents in loan transactions "almost always cost in the tens (or hundreds) of thousands of dollars." "In transactions involving Buyers and Sellers of real estate, it is typical for one side's counsel to take the laboring oar of doing the first draft of documents, with the other side providing comments . . . ." "The drafter is not counsel for the opposing side of the transaction,"[8] and direct communication between a

---

prepare the first draft of the Moorpark Property transaction documents.

[7] Presumably, he meant "buyers" not "borrowers."

[8] Yet here, Katofsky claims he represented Double Play (the seller) and Park (one of the buyers) with respect to the Moorpark Property transaction.

15

lender/seller's counsel and a borrower/buyer is common. Typically, one side pays the costs of document preparation, as "a negotiated term between the parties." The costs are "almost always" tens of thousands of dollars in these types of transactions. "In no real estate transaction does the fact that one side pays for documentation or creates the initial set of documents have any determination or indication of representation."

Based on Katofsky's and Rosenberg's declarations, Park argued an attorney-client relationship was not created between Katofsky and the Kims, and it was unreasonable for Hyun Kwon to believe Katofsky represented the Kims. Park also challenged the credibility of Hyun Park's declarations, pointing out, among other things, that he denied knowing at the time he signed the PSA that Katofsky was the Managing Member of Double Play (the seller), although Hyun Park signed the PSA on the same page where Katofsky signed as the Managing Member of Double Play.

### 2. The Kims' supplemental briefing

On January 5, 2021, with permission from the trial court, the Kims filed a response to Park's sur-reply, supported by a third declaration from Hyun Kwon. In the declaration, he stated he did not realize Katofsky was the Managing Member of Double Play because he "did not pay any attention to who was signing on behalf of the seller as that was not important to [him] at the time." He further stated it was his understanding that Katofsky was providing legal advice to Park, Hesook and him, as they "were all buyers of the Moorpark property." He maintained that Katofsky was "the only lawyer who gave legal advice to [him] and [his] mother regarding the 1031 exchange and the Moorpark

16

[Property] transaction." He noted that in the June 2020 text message exchange, Park referred to Katofsky as " 'our lawyer.' "[9]

In the supplemental brief, the Kims argued, among other things, that attorney Rosenberg's declaration was inadmissible and irrelevant because she had no personal knowledge of the subject transaction; she focused on lender/borrower relationships that are not at issue here; her statement that the "drafter is not counsel for the opposing side of the transaction" is belied by Katofsky's acknowledgement that he drafted the documents as seller's counsel and acted as counsel for one of the buyers (Park); and she stated that payment of fees for document preparation is a negotiated term, but the PSA does not provide that the buyers were responsible for such fees in this case.

## III. Trial Court's Ruling

On January 8, 2021, the trial court heard argument from the parties on the disqualification motion and took the matter under submission. Later, the same day, the court issued a 10-page order granting the Kims' motion to disqualify Katofsky and Salomons.

The trial court concluded Park's substitution of counsel did not render the matter moot. Katofsky Law listed Salomons as an of counsel member of the firm. The court explained, "Attorneys who are 'of counsel' relative to a law firm are subject to imputed disqualification."

The trial court noted that Katofsky was a named plaintiff in the original complaint in which he alleged (as summarized by

---

[9] At the January 8, 2021 hearing on the disqualification motion, Park argued "our lawyer" meant the Park family's lawyer.

the court): "Defendants [the Kims] specifically requested Katofsky to perform significant legal work to protect the 1031 exchange and prepare for the closing of the Moorpark [Property] transaction, and agreed to pay for such, which services cost $32,800.00. [Citation.] Katofsky allege[d] that he had an oral agreement with Defendants whereby Defendants requested and received legal [services], [citation] and that Defendants breached the agreement by failing to pay for such legal services."

The court explained: "Although these allegations are not conclusive judicial admissions because they are contained in a pleading which has been superseded by amendment, such allegations are rebuttable evidentiary admissions. [Citation.] The Court gives much weight to Katofsky's allegations in the original Complaint as evidentiary admissions." The court reasoned that Katofsky's statements—that he represented (and continues to represent) the Park family and has never represented the Kims—must be viewed in the context of his allegations in the original complaint. The court rejected any implication that Katofsky was merely seeking to recover the costs of document preparation through his cause of action in the original complaint, as "$32,800 for document preparation is excessive." The court concluded the "inference is that Katofsky was seeking to recover for legal advice rendered to Defendants [the Kims], not simply their share of document preparation fees." The court found Katofsky presented no proof that the Kims were represented by their own attorney in connection with the Moorpark Property transaction.

The court concluded: "In light of the foregoing evidence [which included consideration of Hyun Kwon's declarations], especially the allegations Katofsky made as Plaintiff in the

18

original Complaint, the court finds that Katofsky represented Defendants [the Kims] in connection with the underlying Moorpark [Property] transaction, which forms the basis of Plaintiff Park's claims against Defendants. As such, access to confidential information is presumed [due to the substantial relationship between the former representation and the current representation], and disqualification of Katofsky is mandatory." Notwithstanding the presumption, the court found Katofsky actually acquired confidential information from the Kims, crediting Hyun Kwon's statements that "he had extensive discussions with Katofsky regarding issues beyond the preparation of the 1031 exchange documents, including tax planning, trust administration, and potential distribution of trust assets."

The court concluded Katofsky's disqualification was imputed to Salomons, reasoning: "The Declarations of Jeff Katofsky and Gary Salomons fail to address the factors which courts consider in deciding whether an ethical wall will impose an effective screen. As such Plaintiff [Park] has not met the burden of rebutting the presumption of imputed knowledge which requires disqualification."

## DISCUSSION

Park contends the trial court erred in disqualifying Katofsky and Salomons from representing her in this action because, among other things, (1) Katofsky never had an attorney-client relationship with the Kims and, (2) even if he did, they had no reasonable expectation that their communications with him would be kept confidential from Park during the prior joint representation. We note that on appeal, Park does not analyze Salomons's disqualification separately and apart from Katofsky's.

19

## I. Katofsky Had an Attorney-Client Relationship With the Kims

" 'Except for those situations where an attorney is appointed by the court, the attorney-client relationship is created by some form of contract, express or implied, formal or informal.' . . . [¶] 'An implied contract is one, the existence and terms of which are manifested by conduct.' (Civ. Code, § 1621.) 'The distinction between express and implied in fact contracts relates only to the manifestation of assent; both types are based upon the expressed or apparent intention of the parties.' " (*Responsible Citizens v. Superior Court* (1993) 16 Cal.App.4th 1717, 1732-1733, italics omitted (*Responsible Citizens*).)

A court considers the totality of the circumstances in determining whether an attorney-client relationship exists. The client's expectation of the situation, measured by a reasonable person in the client's position, is one of the most important factors in the determination. (*Responsible Citizens*, *supra*, 16 Cal.App.4th at p. 1733.)

"The question of whether an attorney-client relationship exists is one of law. [Citations.] However, when the evidence is conflicting, the factual basis for the determination must be determined before the legal question is addressed. [¶] . . . [¶] Generally, in the absence of express findings, we will presume the court found in favor of the prevailing party on all disputed factual issues. [Citation.] Our task in such cases is to determine if the presumed findings are supported by substantial evidence. [Citation.] That presumption is not appropriate, though, when the record reveals the court based its ruling on an interpretation of law, rather than a resolution of disputed facts." (*Responsible Citizens*, *supra*, 16 Cal.App.4th at pp. 1733-1734.)

Here, as the trial court concluded, Katofsky alleged in the original complaint an express oral agreement between the Kims and himself for the provision of legal services. He asserted the Kims asked him to perform "significant legal work," they agreed to pay for it, and they "received legal services." He referenced and attached to the complaint (and Park attached to the first amended complaint) a "copy of an email confirming" such agreement. In the email, Hyun Kwon thanked Katofsky for speaking with him and "explaining 1031 exchange laws" to him. Hyun Kwon outlined proposed terms for an agreement to transfer the Moorpark Property from the Trust to Park a year after the close of escrow, and asked if such terms would "work for the agreement." He told Katofsky he valued his expertise and was "always open for better ways." He encouraged Katofsky to obtain Park's input regarding the proposed terms. Finally, he told Katofsky he would pay him to memorialize the terms outlined in the email exchange.

Neither Katofsky's assertions in the original complaint, nor the contents of Hyun Kwon's email "confirming" the arrangement, suggest Katofsky was merely tasked with preparing a first draft of the PSA and closing documents, at the Kims' expense, for the Kims to review with their own, independent counsel. Rather, substantial evidence shows Katofsky provided legal advice to the Kims regarding how to structure the purchase of the Moorpark Property and transfer their share to Park a year down the line. Katofsky drafted a second agreement for the Kims, to which Park was not a party, regarding the sale of the Moorpark Property to a limited liability company. The trial court found the Kims did not have their own attorney representing them in connection with the Moorpark

21

Property transaction, and they relied on Katofsky's advice and expertise. We have no cause to disturb the trial court's credibility determination on this issue.

Park argues it was not reasonable for the Kims to believe their adversary—the seller/seller's counsel—was representing them—the buyers—in connection with the Moorpark Property transaction. And yet Katofsky acknowledges he was representing Park—the Kims' co-buyer—in the same transaction. That Katofsky was the longtime Park family lawyer and, initially, Park was the only one communicating with him, is beside the point. The record shows there came a time when Hyun Kwon was consulting Katofsky with such frequency that Park faulted him for incurring additional legal fees, to which he responded that he would pay the fees. In emails between Hyun Kwon and Katofsky, and text messages between Hyun Kwon and Park, Hyun Kwon encouraged additional consultation between Katofsky and Park regarding the proposed structure of the transaction that Hyun Kwon was discussing with Katofsky.

As Park emphasizes, "payment of attorney fees alone does not determine an attorney-client relationship; it is merely a factor." (*Strasbourger Pearson Tulcin Wolff Inc. v. Wiz Technology, Inc.* (1999) 69 Cal.App.4th 1399, 1404 (*Strasbourger*).) This is not a case like those Park and her "expert" describe in which a party agrees to pay the opposing side's attorney fees for drafting documents. For one thing, the documents themselves in this case do not memorialize such an agreement. Moreover, there are other factors demonstrating an attorney-client relationship, which we have already reviewed above.

A lengthy discussion of the cases Park relies on is not warranted, as they are readily distinguishable, and her reliance is misplaced. A key factor emphasized in many of these cases is that the party claiming the relationship with an attorney had separate, independent counsel advising the party with respect to the transaction at issue. (See, e.g., *Strasbourger*, *supra*, 69 Cal.App.4th at pp. 1404-1405.) That factor is not present in this case, as the trial court found. As discussed above, substantial evidence demonstrates the only attorney advising the Kims and performing legal work on their behalf with respect to the Moorpark Property transaction was Katofsky.

Having decided there was an attorney-client relationship between Katofsky and the Kims, we must now determine whether a disqualifying conflict of interest exists.

## II. Katofsky's Former Joint Representation of Park and the Kims is Substantially Related to Katofsky's Current Representation of Park, and Access to Confidential Information Is Presumed

Under the State Bar Rules of Professional Conduct, "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed written consent." (Rules Prof. Conduct, rule 1.9(a).) The " 'chief fiduciary value jeopardized' " in such a successive representation " 'is that of client confidentiality.' " (*M'Guinness v. Johnson* (2015) 243 Cal.App.4th 602, 613, italics omitted (*M'Guinness*).)

"In successive representation cases, where the former client seeks to disqualify counsel from representing a successive client

23

in current litigation adverse to the former client's interest, the former client must 'demonstrate a "substantial relationship" between the subjects of the antecedent and current representation.' " (*M'Guinness, supra*, 243 Cal.App.4th at p. 614, italics omitted.)  If the prior "representation was 'direct—that is, where the lawyer was personally involved in providing legal advice and services to the former client' [citation] the only question is whether there is a substantial relationship between the subject of the prior representation and the subject of the current representation.  If the answer is yes, 'access to confidential information by the attorney in the course of the first representation (relevant, by definition, to the second representation) is presumed and disqualification of the attorney's representation of the second client is mandatory. . . .' " (*Fiduciary Trust Internat. of California v. Superior Court* (2013) 218 Cal.App.4th 465, 479 (*Fiduciary Trust*).)  "On the other hand, where the former attorney-client relationship is peripheral or attenuated instead of direct, then the presumption will not be applied in the absence of an adequate showing that the attorney was in a position vis-à-vis the client to likely have acquired confidential information."  (*Jessen v. Hartford Casualty Ins. Co.* (2003) 111 Cal.App.4th 698, 710.)

"In determining whether a conflict of interest requires disqualification," the " 'paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar.  The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process.' " (*Fiduciary Trust, supra*, 218 Cal.App.4th at p. 478.)

24

" 'Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.]' [Citation.] As to disputed factual issues, a reviewing court's role is simply to determine whether substantial evidence supports the trial court's findings of fact; 'the reviewing court should not substitute its judgment for . . . express or implied [factual] findings [that are] supported by substantial evidence. [Citations.]' [Citation.] As to the trial court's conclusions of law, however, review is de novo; a disposition that rests on an error of law constitutes an abuse of discretion. [Citations.] The trial court's 'application of the law to the facts is reversible only if arbitrary and capricious.' " (*In re Charlisse C.* (2008) 45 Cal.4th 145, 159.)

Katofsky's representation of the Kims was direct, not peripheral or attenuated. Hyun Kwon, on behalf of himself and Hesook, was in consultation with Katofsky, and Katofsky provided legal services directly to the Kims (as he alleged in the original complaint). It is obvious there is a substantial relationship between Katofsky's prior joint representation of Park and the Kims and the current representation of Park—they involve the same real property transaction. Accordingly, Katofsky's access to confidential information during the course of the prior representation is presumed and Katofsky's/Salomons's disqualification from the current representation is mandatory. Katofsky advised the Kims how to structure the Moorpark Property transaction for tax planning and trust administration purposes; now, members of his firm (first himself, then Salomons) are representing Park in prosecuting this action against the Kims, challenging the Kims' actions with respect to the same transaction.

25

Park argues a substantial relationship between the prior and current representations is not sufficient to require Katofsky's/Salomons's disqualification because Katofsky was not in a position in the prior representation to receive confidential information from the Kims that they would have reasonably expected Katofsky to keep confidential from Park. Our analysis here does not turn on Evidence Code section 962, however,—the exception to the attorney-client privilege between joint clients. This statutory provision does not "create[] a blanket exception to the prohibition on adverse, successive representations in cases where the attorney jointly represented the parties in the prior matter." (*Fiduciary Trust*, *supra*, 218 Cal.App.4th at p. 482.)

Moreover, cases that have indicated "there may be some circumstances under which an attorney may represent one former joint client against another in a substantially related matter" typically turn on the salient and distinguishable factor we highlighted above—whether the party claiming the relationship with an attorney had separate, independent counsel advising the party with respect to the transaction at issue. As one appellate court explained:

"While we agree an attorney should not always be free to represent one former joint client against another merely because of the joint-client exception to the attorney-client privilege and we can easily envision situations where such action would seriously undermine the integrity of the attorney-client relationship, the present case is not such a situation. Here petitioner [a contractor] maintained an attorney-client relationship with his personal attorney. There is no evidence petitioner ever reposed confidence and trust in [a surety's attorney's firm] or ever sought or obtained advice from [the

26

surety's attorney] but rather at all times looked solely to his personal attorney not only to advise him but to represent his interests vis-a-vis [the surety's attorney] and [the surety]. Petitioner knew [the surety's attorney] considered [the surety] its primary client and knew that in the event of a conflict between petitioner [the contractor] and [the surety], [the surety's attorney] would continue to represent [the surety]. Thus our conclusion is based on the specific facts present. Our conclusion would be significantly altered if petitioner [the contractor] had not been independently represented by counsel or if there was evidence that petitioner [the contractor] looked to both its personal counsel and [the surety's counsel] for advice and counsel." (*Cornish v. Superior Court* (1989) 209 Cal.App.3d 467, 477-478.)

Under the facts and circumstances of this case, the trial court did not abuse its discretion in ordering the disqualification of Katofsky and Salomons. There was no legal error, and the court's factual findings are supported by substantial evidence.

**DISPOSITION**

The order is affirmed. Respondents are entitled to recover their costs on appeal.

NOT TO BE PUBLISHED


CHANEY, J.

We concur:


ROTHSCHILD, P. J.                    WEINGART, J.

27